# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 10, 2010

No. 10-30080, No. 10-30146

Lyle W. Cayce
Clerk

In Re:

ANH CAO, also know as Joseph Cao; REPUBLICAN NATIONAL COMMITTEE; REPUBLICAN PARTY OF LOUISIANA

_____

ANH CAO, also known as Joseph Cao; REPUBLICAN NATIONAL COMMITTEE,

Plaintiffs-Appellants

v.

FEDERAL ELECTION COMMISSION,

Defendant-Appellee

On Certification and Appeal
from the United States District Court for the Eastern District of Louisiana
2:08-CV-4887

Before JONES, Chief Judge, KING, JOLLY, DAVIS, SMITH, WIENER, GARZA, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.

W. EUGENE DAVIS and FORTUNATO P. BENAVIDES, Circuit Judges:

The challenges raised in the present case require this court to decide whether certain provisions of the Federal Election Campaign Act ("FECA" or

No. 10-30080, No. 10-30146

"the Act") of 1971, 2 U.S.C. § 431 *et seq.*,[1] violate the Plaintiffs' right to free speech under the First Amendment. Applying Supreme Court precedent, we conclude that each of the challenged FECA provisions constitutes a constitutionally permissible regulation of political parties' campaign contributions and coordinated expenditures. Accordingly, we find that none of the challenged provisions unconstitutionally infringe upon the rights of the Plaintiffs to engage in political debate and discussion.

I.

Plaintiff Anh "Joseph" Cao is the United States Representative for the Second Congressional District of Louisiana, and Plaintiff Republican National Committee ("RNC") is the national political party committee of the Republican Party.[2] On November 13, 2008, just before the December 6, 2008 election, the Plaintiffs filed a suit for declaratory judgment,[3] asserting eight constitutional challenges to various provisions of FECA. Generally, the Plaintiffs challenge the statutory provisions limiting the RNC's contributions to, and expenditures made in coordination with, Cao's 2008 congressional campaign.

The district court, abiding by its proper role in addressing a 2 U.S.C. § 437h challenge,[4] identified the constitutional issues in the complaint, held

---

[1] As amended by the Bipartisan Campaign Reform Act ("BCRA") of 2002, Pub. L. No. 107-155, 116 Stat. 81 (2002).

[2] Initially, the Republican Party of Louisiana ("LA-GOP") was also a Plaintiff to the action. The district court, however, determined that the LA-GOP did not have standing under 2 U.S.C. § 437h. No party has appealed this portion of the district court's order. Accordingly, the LA-GOP is no longer a party to the case now before the court.

[3] Plaintiffs' complaint raises claims under the First and Fifth Amendments, FECA, 2 U.S.C. § 437h, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

[4] Section 437h provides:

The Commission, the national committee of any political party, or any

No. 10-30080, No. 10-30146

evidentiary hearings concerning those issues, and made necessary findings of fact. *See Khachaturian v. FEC*, 980 F.2d 330, 332 (5th Cir. 1992) (en banc).  In doing so, the district court began by discussing the general contribution and expenditure limitations FECA places on political parties.  *Cao v. FEC*, 688 F. Supp. 2d 498, 508-17 (E.D. La. 2010) ("*Cao (District Court)*").  Specifically examining how FECA affected the RNC's contributions and expenditures related to the 2008 Cao campaign, the district court then found that the RNC spent all of the $42,100 it was allowed to spend on coordinated expenditures under the Party Expenditure Provision, 2 U.S.C. § 441a(d)(2)–(3),[5] and reached its $5,000

---

individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act.  The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

[5]  Section 441a(d)(2)–(3) states:

(2) The national committee of a political party may not make any expenditure in connection with the general election campaign of any candidate for President of the United States who is affiliated with such party which exceeds an amount equal to 2 cents multiplied by the voting age population of the United States (as certified under subsection (e) of this section). Any expenditure under this paragraph shall be in addition to any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States.

(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—

> (A) in the case of a candidate for election to the office Senator, or of Representative from a State which is entitled to only one Representative, the greater of—

>> (i) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or

3

No. 10-30080, No. 10-30146

contribution limit under § 441a(a)(2)(A).[6]  *Id.* at 532.  Additionally, the district court found that the RNC would have spent additional money on speech expressly advocating the election of Cao had it been permitted to spend beyond FECA limitations.  *Id.* at 532-33.

Upon hearing the evidence and making the necessary findings of fact, the district court evaluated the Plaintiffs' eight constitutional challenges and, pursuant to § 437h, certified four questions to this en banc court.  *Id.* at 549. The district court dismissed the Plaintiffs' remaining four challenges as frivolous.  *Id.*  Subsequently, the Plaintiffs appealed the district court's dismissal of the non-certified, frivolous questions.  For purposes of judicial economy and efficiency, we consolidated the Plaintiffs' appeal of the dismissal of the non-certified questions with the court's en banc consideration of the certified questions.

We review the constitutionality of questions certified pursuant to § 437h *de novo*.  *See Goland v. United States*, 903 F.2d 1247, 1252 (9th Cir. 1990).  We review the district court's dismissal of the Plaintiffs' remaining claims as frivolous for abuse of discretion.  *Id.*

II.

This appeal requires us to address the intersection of congressional campaign finance reform with the fundamental right to free speech under the First Amendment.  Since the landmark decision of *Buckley v. Valeo*, 424 U.S. 1

---

(ii) $20,000; and

(B)  in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.

[6] Section 441a(a)(2)(A) states that "(2) No multicandidate political committee shall make contributions—(A) to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000 . . . ."

(1976), the Supreme Court on a number of occasions has evaluated the limitations that the First Amendment imposes on the Government's ability to preserve the integrity of the democratic election process through its regulation of campaign expenditures and contributions made to federal candidates.  As such, many of the Plaintiffs' constitutional challenges raise questions the Supreme Court has previously addressed.  Thus, we begin our analysis with a brief examination of the constitutional contours in which we find ourselves.

In *Buckley*, the Supreme Court determined that FECA's "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities."  *Id.* at 14.  The *Buckley* Court declared that the "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution."  *Id.*  As a result, the *Buckley* Court applied a strict level of scrutiny to the Government's restrictions "on the amount of money a person or group can spend on political communication during a campaign [since such restrictions] necessarily reduc[e] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."  *Id.* at 19.

Although the *Buckley* Court recognized that FECA's limitations implicate important First Amendment concerns, the Supreme Court's application of strict scrutiny did not result in the invalidation of all of FECA's regulations.  *See id.* 19–21.  Instead, the *Buckley* Court determined that some governmental intrusions on an individual's (or political party's) First Amendment right to make financial contributions to a candidate's campaign were warranted based on the Government's compelling interest to prevent corruption in the election of federal officials.  *Id.* at 20–21, 26–27.  The Court reasoned that:

> To the extent that large contributions are given to secure a political
> quid pro quo from current and potential office holders, the integrity

No. 10-30080, No. 10-30146

> of our system of representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.

*Id.* at 26–27.[7]  The *Buckley* Court recognized that FECA's contribution limits were Congress' response to the rising levels of corruption in the election of public officials.  *Id.* at 26.  Consequently, the Court found that the governmental interest in preserving the integrity of our democratic system was paramount. *Id.* at 27.

In addition to articulating the compelling governmental interest for FECA's limitations on campaign contributions, the *Buckley* Court also articulated the constitutional distinction between FECA's regulations of *contributions* and *expenditures*, concluding that courts must apply a greater degree of constitutional scrutiny to FECA's regulations of expenditures. *See id.* at 23.  The Court determined that FECA's regulations on expenditures placed greater restrictions on First Amendment rights because they "represent[ed] substantial rather than merely theoretical restraints on the quantity and diversity of political speech," and consequently, the Court applied a more exacting degree of constitutional scrutiny to expenditure limitations. *Id.* at 19, 47–48.  The Court further distinguished the Government's regulation of contributions from its regulation of expenditures, reasoning that "[b]y contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20.  Accordingly, the *Buckley* Court recognized that the level of constitutional scrutiny for contribution

---

[7] In addition to actual corruption, the *Buckley* Court found that the Government had a compelling interest in preventing the appearance of corruption. *Id.* at 27.

limitations was less than the level of constitution scrutiny applied to limitations on expenditures. *See id.* at 29, 35, 38.

In further articulating the constitutional distinction between contributions and expenditures, the Court carefully distinguished *independent* expenditures from those expenditures that are "prearranged or coordinated" with a particular candidate. *Id.* at 46–47. Following the terminology used in FECA, the *Buckley* Court considered that for purposes of First Amendment scrutiny, "prearranged or coordinated expenditures" are constitutionally equivalent to contributions. *Id.* at 46. According to the Court, it followed that coordinated expenditures are subject to the same limitations and scrutiny that apply to contributions. *Id.* at 47. Although the facts of the challenge and nature of the Court's analysis in *Buckley* gave the Court no reason to specifically address the level of scrutiny for coordinated expenditures, the *Buckley* Court implicitly recognized that limitations on coordinated expenditures would be, like contribution limitations, subject to a lower level of constitutional scrutiny than limitations on independent expenditures.

The *Buckley* Court's distinction between coordinated expenditures (or contributions) and independent expenditures was reaffirmed in *California Medical Ass'n v. FEC*, 453 U.S. 182, 195 (1981), when the Court explained that "[t]he type of expenditures that this Court in *Buckley* considered constitutionally protected were those made *independently* by a candidate, individual, or group in order to engage directly in political speech." *Id.* (citation omitted) (emphasis added). In cases thereafter, the Court continued to recognize the distinction between a speaker's First Amendment right to make independent versus coordinated expenditures, and the degree to which lower courts must balance these rights with the Government's compelling interest to prevent corruption in the democratic elections of our public officials. *E.g., Colorado Republican Fed.*

*Campaign Comm. v. FEC*, 518 U.S. 604, 613 (1996) ("*Colorado I*"); *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431 (2001) ("*Colorado II*").

With this legal landscape in mind, we begin our examination of the Plaintiffs' constitutional challenges by first examining the questions the district court found to be frivolous.

## A.  Frivolous Questions

### 1.

The district court did not certify the Plaintiffs' second and fifth questions in their complaint, which raise clearly related issues. *Cao* (*District Court*), 688 F. Supp. 2d at 535-39.  The Plaintiffs' second question reads as follows:

> Do the Party Expenditure Provision limits at 2 U.S.C. § 441a(d)(2)–(3) violate the First and Fifth Amendment rights of one or more plaintiffs in that they are excessively vague, overbroad, and beyond the authority of Congress to regulate elections as applied to coordinated expenditures other than (a) communications containing express advocacy, (b) targeted federal election activity, (c) disbursements equivalent to paying a candidate's bills, and (d) distributing a candidate's campaign literature?

*Id.* at 504.  The Plaintiffs' fifth question reads as follows:

> Do the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) and the Coordinated Contribution Provision at 2 U.S.C. § 441a(a)(7)(B)(i) (treating coordinated expenditures as in-kind 'contributions') violate the First and Fifth Amendment rights of one or more of the plaintiffs in that they are excessively vague, overbroad, and beyond the authority of Congress to regulate elections as applied to coordinated expenditures other than (a) communications containing express advocacy, (b) targeted federal election activity, (c) disbursements equivalent to paying a candidate's bills, and (d) distributing a candidate's campaign literature?

*Id.*

The Plaintiffs assert that §§ 441a(d)(2)–(3), 441a(a)(2)(A), and 441a(a)(7)(B)(i)[8] reach speech that is not "unambiguously campaign related," and therefore, the provisions are overbroad and vague in violation of the Supreme Court's decision in *Buckley*. *See Buckley*, 424 U.S. at 81. We do not agree.

FECA must be read in light of the FEC regulations that implement the statute. Expenditures for a "party coordinated communication," as defined by 11 C.F.R. § 109.37, are restricted to those which qualify as coordinated expenditures that may be regulated under the Constitution as contributions. In other words, the FEC regulations make it clear that a "party coordinated communication" only encompasses speech that is campaign-related.[9] Thus, § 109.37 limits the breadth of communications to which §§ 441a(d)(2)–(3), 441a(a)(2)(A), and 441a(a)(7)(B)(i) apply. Therefore, the Plaintiffs' argument that these statutory provisions reach speech that is not campaign-related is without merit. *Buckley* does not permit non-campaign-related speech to be regulated.

> In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L. Ed. 2d 659 (1976), the Supreme Court, invoking constitutional avoidance,

---

[8] Section 441a(a)(7)(B)(i) states that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate . . . ."

[9] Section 109.37 defines "party coordinated communications" as those communications that are (1) paid for by the party, (2) satisfy a particular content standard, and (3) coordinated with the candidate as defined by § 109.21(d)(1)–(6). The content standards set forth in § 109.37 require that the communication be either "[a] public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing," or "[a] public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office," or a "public communication [that] refers to a clearly identified House or Senate candidate and is publicly distributed . . . in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general, special, or runoff election, or primary or preference election, or nominating convention or caucus." Section 109.37(a)(2)(iii)(B) provides a similar 120 day time period for public communications referring to a Presidential or Vice Presidential candidate.

construed FECA's limitation on expenditures to apply only to funding of communications that "express[ly] . . . advocate the election or defeat of a clearly identified candidate for federal office," i.e., those that contain phrases such as "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [or] 'reject.'" *Id*. at 43–44 & n.52.

*Shays v. FEC*, 528 F.3d 914, 917 (D.C. Cir. 2008). The FEC regulations make abundantly clear that the only coordinated expenditures captured by the statutory reach of FECA are campaign-related expenditures which *Buckley* recognized that Congress could regulate as contributions.

Plaintiffs argued to the district court that the FEC's promulgation of the above regulation constitutes an acknowledgment that some line exists between speech which may be regulated and speech which may not be regulated. *See Cao* (*District Court*), 688 F. Supp. 2d at 536. This acknowledgment, Plaintiffs argued, "demonstrates a constitutionally deficient  ambiguity in the current statutory language." *Id*. We know of no authority, and Plaintiffs cite to no authority, that requires the content of FEC regulations be included in statute or that prohibits a statute's reach to be narrowed by regulations. Accordingly, we find that the district court did not abuse its discretion in denying the certification of the Plaintiffs' second and fifth questions.

2.

The district court also found the Plaintiffs' fourth question frivolous and denied its certification. *Cao* (*District Court*), 688 F. Supp. 2d at 542-43. The Plaintiffs' fourth constitutional challenge reads as follows:

Do the limits on coordinated expenditures at 2 U.S.C. § 441a(d)(3) violate the First Amendment rights of one or more plaintiffs? (a) Do all but the highest limits violate such rights because any lower rates are unsupported by the necessary anti-corruption interest? (b) Is 2 U.S.C. § 441a(d)(3) facially unconstitutional because lower rates cannot be severed from higher rates and the voting-age-population formula is substantially overbroad and inherently unconstitutional?

No. 10-30080, No. 10-30146

(c) Is the highest limit for expenditures coordinated with Representatives unconstitutionally low?

*Id.* at 504.

The Plaintiffs argue that the multiple limits contained in § 441a(d)(3) mean that the Congress acknowledges that the higher limits are sufficient to accommodate any interest in preventing corruption, and thus the lower limits are automatically unnecessary to advance that anti-corruption interest.[10] This argument leads the Plaintiffs to conclude that any lower limits within a multiple-limit scheme are inherently unconstitutional.

The Supreme Court rejected this argument in *Buckley* when the Court declared that "Congress' failure to engage in such fine tuning does not invalidate the legislation." *Buckley*, 424 U.S. at 30.   Although there may be variances within a statute's limitations on contributions or expenditures, so long as the Government can establish "that some limit . . . is necessary, a court has no scalpel to probe . . . ." or parse through the varying degrees of limitations. *Id.* (quotations and citations omitted).   "In practice, the legislature is better equipped to make such empirical judgments, as legislators have [the] 'particular expertise'" necessary to assess what limits will adequately prevent corruption in the democratic election of their peers. *Randall v. Sorell*, 548 U.S. 230, 248 (2006).

Plaintiffs also assert that § 441a(d)(3) is unconstitutional because the limitations imposed on contributions to different candidates vary depending on the voting age population in their respective districts.   This challenge is similarly frivolous as it is foreclosed by *Nixon v. Shrink Missouri Government*

---

[10] For example, under § 441a(d)(3), the RNC may make expenditures of up to $20,000 in connection with a candidate for U.S. Senate, but may only make expenditures of up to $10,000 in connection with a candidate for the U.S. House of Representatives.   Plaintiffs argument is that because § 441a(d)(3)(A)(ii) allows for expenditures of up to $20,000 for Senate candidates, the $10,000 restriction for House candidates is unconstitutionally low.

11

*PAC*, 528 U.S. 377, 382 (2000), in which the Court upheld the constitutionality of a "statute impos[ing] contribution limits ranging from $250 to $1,000, depending on specified state office or size of constituency."

Finally, in regards to the Plaintiffs' challenge that the highest limit for expenditures coordinated with Representatives is unconstitutionally low, the Plaintiffs have failed to provide the court with any evidence upon which we could conclude that the limits impose too stringent of a burden on political speech. *See Buckley*, 424 U.S. at 21 (explaining that whether a contribution limitation is unconstitutionally low in part depends on whether the limitation prevents the candidate from "amassing the resources necessary for effective [campaign] advocacy . . . ."); *see also Khachaturian*, 980 F.2d at 331 ("To present a colorable constitutional question in [an] as applied challenge, [the Plaintiff] must demonstrate that the [Act's] limit had a serious adverse effect on the initiation and scope of his candidacy."). Thus, in arguing that the challenged limits are unconstitutionally low, the Plaintiffs have failed to provide evidence demonstrating that the limits preclude federal candidates from effectively amassing the resources necessary to wage an effective campaign.[11]

Consequently, we find that the district court did not abuse its discretion in finding the Plaintiffs' fourth question frivolous.

3.

Although the district court certified question 8(a), it found 8(b) and 8(c) to be frivolous. Plaintiffs offer no argument or authority in their briefs to assert that the district court erred in dismissing question 8(b). "When an appellant fails to advance arguments in the body of its brief in support of an issue it has

---

[11] Quite to the contrary, the evidentiary record reveals that Cao has had no difficulty amassing an impressive amount of resources for his campaigns. During the 2008 cycle, then-candidate Cao's congressional campaign had receipts of $242,531. As of June 30, 2009, he had reported $516,957 in total receipts.

No. 10-30080, No. 10-30146

raised on appeal, we consider such issues abandoned." *Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp.*, 75 F.3d 1057, 1067 (5th Cir. 1996). Accordingly, we find the Plaintiffs have waived their appeal of question 8(b).

The Plaintiffs' eighth question in 8(c) states:

Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) facially violate the First Amendment rights of one or more plaintiffs [because] . . . (c) [t]he limit is simply too low to allow political parties to fulfill their historic and important role in our democratic republic?

*Cao* (*District Court*), 688 F. Supp. 2d at 504.

The Plaintiffs contend that § 441a(a)(2)(A)'s $5,000 contribution limitation is unconstitutionally low because it prohibits political parties from fulfilling their historic role in "our democratic republic." While the Plaintiffs offer powerful rhetoric in support of this position, the record does not support the rhetoric. As the district court found, during the 2007–08 election cycle, the national parties raised more money than they raised in the election cycles before the effective date of the BCRA when the parties were also able to raise "soft" money, i.e. money that was not subject to the limitation or prohibitions of FECA. *See Cao* (*District Court*), 688 F. Supp. 2d at 517.[12] Because Plaintiffs evidence failed to support their argument, the district court did not abuse its discretion in concluding that subsection (c) of the Plaintiffs' eighth question is frivolous.

B. Certified Questions

---

[12] The district court's factual findings further support the district court's conclusion that the $5,000 limitation does not preclude parties from fulfilling their roles in funding the campaigns of federal candidates. As the district court noted, "[i]n the 2008 election cycle, parties supported their federal candidates with a total of $529,262 in contributions, $31,256,379 in coordinated expenditures, and $54,563,499 in independent expenditures." *Cao* (*District Court*), 688 F. Supp. 2d at 549.

No. 10-30080, No. 10-30146

Having found the district court did not abuse its discretion in finding the above questions frivolous, we now turn to the questions certified to the en banc court.

1.

The district court certified the first constitutional question as follows:

Has each of the plaintiffs alleged sufficient injury to constitutional rights enumerated in the following questions to create a constitutional 'case or controversy' within the judicial power of Article III?

*Cao* (*District Court*), 688 F. Supp. 2d at 504.

As the Supreme Court observed, "[a] party seeking to invoke § 437h must have standing to raise the constitutional claim." *California Med. Ass'n*, 453 U.S. at 193 n.14. This requires us to decide "whether appellants have the 'personal stake in the outcome of the controversy' necessary to meet the requirements of Art. III." *Buckley*, 424 U.S. at 11 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "Standing requires, at a minimum, three elements: injury in fact, a 'fairly traceable' causal link between that injury and the defendant's conduct, and the likelihood that the injury will be 'redressed by a favorable decision.'" *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In the present case, the Plaintiffs have met their Article III burden. First, the complaint alleges an injury that is concrete, not hypothetical. The complaint establishes that the RNC spent all of its $42,100 in expenditures on Cao's election campaign allotted under the Party Expenditure Provision and reached its $5,000 contribution limit. Furthermore, the complaint alleges that during the course of Cao's campaign, the RNC wanted to make additional expenditures, and but for the $42,100 Party Expenditure Provision making it illegal to do so,

14

the RNC would have made these expenditures. This injury is not conjectural, but rather, is sufficiently concrete to satisfy the requirements of Article III.

Moreover, the Plaintiffs' alleged injury is fairly traceable to the FEC's conduct, as it is the FEC's implementation of the Act and its regulations that render the Plaintiffs' desired speech illegal. The Plaintiffs also satisfy *Lujan*'s third requirement, redressability, since a favorable ruling by this en banc court would permit the Plaintiffs to make further monetary contributions and carry out their desired coordinated speech acts—without any fear that the Government would regulate their coordinated expenditures pursuant to FECA.

Therefore, Plaintiffs have demonstrated sufficient Article III standing to bring their constitutional claims.

2.

The district court certified the third question as follows:

Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) violate the First Amendment rights of one or more plaintiffs as applied to a political party's in-kind and direct contributions because it imposes the same limits on parties as on political action committees?

*Cao* (*District Court*), 688 F. Supp. 2d at 504.

In the third certified question, the Plaintiffs claim that § 441a(a)(2)(A)'s limitation violates the First Amendment because it imposes the same contribution limitations on parties as it does on political action committees ("PACs"). The Plaintiffs raise three arguments in support of this proposition: first, that the Supreme Court's decisions in *Buckley* and *Colorado I* support the notion that political parties' political speech deserves a higher degree of protection than the political speech of PACs; second, that the $5,000 contribution limitation violates *Randall*; and third, that the Supreme Court's decision in *Citizens United v. FEC*, 130 S.Ct. 876, 899 (2010), should alter the analysis of

contribution limits FECA places on political parties and PACs. These arguments are without merit.

First, the Plaintiffs misconstrue the principal holdings in *Buckley* and *Colorado I*. Although the Court in both *Buckley* and *Colorado I* acknowledged the important historic role that political parties have played in the democratic election of this Nation's public officials, the Court simultaneously acknowledged that it is this precise role that political parties fill that gives rise to the Government's compelling interest in regulating their coordinated expenditures and contributions. Notably, the *Colorado II* Court effectively rejected the argument Plaintiffs now make, reasoning that:

> The Party's arguments for being treated differently from other political actors subject to limitation on political spending under the Act do not pan out. . . . In reality, parties . . . function for the benefit of donors whose object is to place candidates under obligation, a fact that parties cannot escape. Indeed, parties' capacity to concentrate power to elect is the very capacity that apparently opens them to exploitation as channels for circumventing contribution and coordinated spending limits binding on other political players.

*Colorado II*, 533 U.S. at 455. Thus, to the extent that the Plaintiffs attempt to argue that *Buckley* and *Colorado I* support the proposition that the Government cannot place the same restrictive contribution limitations on political parties that it places on PACs, that argument is foreclosed by *Colorado II*—where the Supreme Court's analysis fully supports the Government's differential treatment of political parties—because of what *Colorado II* recognized as a political party's unique susceptibility to corruption.

Second, the Plaintiffs misread *Randall* when they argue that the Court's decision turned on the fact that PACs and political parties were treated equally. In *Randall*, the Court struck down the State of Vermont's Act 64 requiring "that political parties abide by exactly the same low contribution limits that apply to

other contributors," 548 U.S. at 256, because the contribution limitations were "suspiciously low" and would seriously impair political parties' ability to effectively participate in the political process.  *Id.* at 257, 261.  In the present case, FECA does not impose a "suspiciously low" limitation on a political party's contribution, but rather, affords a more reasonable limitation of $5,000.[13]  Consequently, the Supreme Court's invalidation of Act 64 in *Randall* is entirely inapposite to the present constitutional challenge, and therefore does not support Plaintiffs' challenge to § 441a(a)(2)(A).

Third, we do not read *Citizens United* as changing how this court should evaluate contribution limits on political parties and PACs.  In *Citizens United*, the Court held that corporations and labor unions had the right under the First Amendment to make *independent* campaign expenditures.  130 S.Ct. at 913.  This conclusion—that independent expenditures may not be restricted—has been the rule for political parties since *Colorado I.  See Colorado II*, 533 U.S. at 455 ("[U]nder *Colorado I*, [a political party has had the ability] to spend money in support of a candidate without legal limit so long as it spends independently.  A party may spend independently every cent it can raise wherever it thinks its candidate will shine, on every subject and any viewpoint.").[14]  Thus, the Supreme Court's decision in *Citizens United*—regarding a corporation's right to make independent expenditures—provides no reason to change our analysis of the validity of the contribution limits FECA places on political parties and PACs.

For the above reasons, we find that § 441a(a)(2)(A)'s $5,000 contribution

---

[13] The *Randall* Court provided two additional reasons for finding Act 64 unconstitutional:  first, the state statute provided no generous additional limit for coordinated party expenditures, and second, each limit applied to all national, state, and local affiliates of a party combined, as well as both the primary and general elections combined.  *See id.* at 257, 249, 259.  These factors are noticeably absent from the Plaintiffs' present challenge.

[14] Notably, in the 2008 election cycle, political parties made $280,873,688 in independent expenditures.  *Cao* (*District Court*), 688 F. Supp. 2d at 518.

limitation is constitutional. The fact that the Government's "closely drawn" contribution limitation applies equally to both political parties and PACs is of no constitutional moment.

3.

The district court certified the fourth question as follows:

Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) facially violate the First Amendment rights of one or more plaintiffs because it is not adjusted for inflation?

*Cao* (*District Court*), 688 F. Supp. 2d at 504.

In fashioning their argument that the $5,000 contribution limit is unconstitutional because it is not adjusted for inflation, the Plaintiffs rely heavily on the Supreme Court's decision in *Randall v. Sorrell*. While the failure to index for inflation was one reason the Court struck down Vermont's contribution limitation, the *Randall* Court reasoned that "[a] failure to index limits means that limits which are already suspiciously low . . . will almost inevitably become too low over time." 548 U.S. at 261. The Court's statement does not, in turn, mean that all contribution limits not indexed for inflation are automatically "suspiciously low" and unconstitutional. In the present case, FECA's $5,000 limitation in § 441a(a)(2)(A) is not comparable to Vermont's $200–$400 limitation. Consequently, we are not presented with circumstances in which the failure to index for inflation is coupled with a contribution limitation so "suspiciously low" that it warrants this court's judicial supervision to prevent the limitation from becoming "too low over time."

Furthermore, the Plaintiffs' argument that this court should invalidate § 441a(a)(2)(A) based on its failure to index for inflation alone overlooks the Supreme Court's decision in *Buckley*, where the Court recognized that "Congress' failure to engage in such fine tuning does not invalidate the legislation."

*Buckley*, 424 U.S. at 30.[15]   So long as the Government can establish "that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." *Id.* (quotations and citations omitted).  As this Court does not possess the "particular expertise" attributable to legislators who are "better equipped to make such empirical judgments," we decline the opportunity to "determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives." *Randall*, 548 U.S. at 248.

Accordingly, we find § 441a(a)(2)(A)'s $5,000 contribution limitation survives the Plaintiffs' constitutional challenge presented in the fourth certified question.

### III.

The only remaining question requires a more detailed discussion.  The second question certified to the en banc court asks:

> Do the expenditure and contribution limits and contribution provision in 2 U.S.C. §§ 441a(a)(2–3), 441a(a)(2)(A), and 441a(a)(7)B)(i) violate the First Amendment rights of one or more of [the] plaintiffs as applied to coordinated communications that convey the basis for the expressed support?

*Cao* (*District Court*), 688 F. Supp. 2d at 504.

This question arose out of the RNC's desire to spend in excess of the amount allowed for coordinated campaign expenditures under the Party Expenditure Provision.  Particularly, the RNC wanted to expend its funds to run a radio advertisement in support of Cao (hereinafter "the Cao ad").  The proposed Cao ad said:

> Why We Support Cao

---

[15] It is worth noting that no court has ever invalidated a contribution limitation based solely on its failure to index for inflation.

The Republican National Committee has long stood for certain core principles, which we believe are the fundamentals of good government. When it comes to the issues of lower taxes, individual freedoms and a strong national defense, we need leaders who will stand with the American people and defend those issues.

We need leaders who understand that our economy is in a recession, our individual freedoms are constantly under attack and we continue to fight the global war on terrorism to keep our families safe.

Joseph Cao understands and fights for those issues. And, that is why we ask you to join us in supporting him on December 6. It's important for Louisiana and important for the country.

*Id.* at 532. The RNC wanted to coordinate with the Cao campaign as to the "best timing" for the Cao ad. *See* Joint Stipulation of Fact ¶ 32. However, as the RNC readily admitted at oral argument before the en banc court and its 28(j) letter to the court, the RNC's involvement with the Cao campaign amounted to coordination,[16] and the RNC already had spent the entire amount it was allowed

---

[16] The following exchange took place at oral argument:

Judge Davis:   When the party allowed the candidate to, consult the candidate on timing, and apparently that's all we know and that's all that's knowable because nothing took place, why is that not coordinated . . .

Plaintiffs' Counsel:   It is.

Judge Davis:   . . . under the regulations it probably would be . . .

Plaintiffs' Counsel:   It is.

Judge Davis:   . . . why is it not?

Plaintiffs' Counsel:   It is. Absolutely. To consult with the timing it means that it is coordinated. Now, they would rather talk about, you know, what happens if the candidate, you know, wrote the ad and gave it to the party. Well there's no like degree of being pregnant. It's either coordinated or not coordinated . . . .

Plaintiffs' counsel further stated in response to a question from Judge Owen that ". .

to spend on coordinated campaign expenditures under FECA. Therefore, the RNC concluded that it could not coordinate with the Cao campaign to run the Cao ad without violating FECA. Ultimately, the RNC chose to not expend its funds to air the Cao ad and brought this challenge to FECA's restrictions on coordinated expenditures.

Because we are a court of error and only decide issues the parties bring to us, it is important at the outset to identify the RNC's sole argument on this certified question. *See Sherman v. United States*, 356 U.S. 369, 376 (1958) ("We do not ordinarily decide issues not presented by the parties . . . ."). The RNC argues—and *only* argues—that §§ 441a(d)(2)–(3), 441a(a)(2)(A), and 441a(a)(7)(B)(i) violate its First Amendment rights because the provisions regulate the RNCs "own speech." The RNC asserts that its own speech may not be regulated, regardless of whether the speech is coordinated.[17] "Own speech" is defined by the RNC as speech that is "attributable" to the RNC and includes speech the candidate writes and decides how the speech is to be disseminated. In other words, the RNC argues that speech it adopts is attributed to it and therefore exempt from regulation regardless of the extent of coordination with the candidate.

With respect to this certified issue, the broad "own speech" argument is the only argument the RNC raised in its complaint,[18] the only argument the district court addressed,[19] the only argument the RNC raised in its briefs to the

---

. [O]ur argument is if it is our speech it doesn't make it independent. We acknowledge that the Cao ad, and they [the FEC] acknowledge that the Cao ad, is coordinated."

[17] Presumably this argument would apply to any person's or entity's "own speech."

[18] *See* Second Amended Complaint, ¶¶ 43–44, 83–85.

[19] *See* Cao (*District Court*), 688 F. Supp. 2d at 539-42.

en banc court,[20] and the only argument the RNC's counsel was willing to make at oral argument before the en banc court. In response to friendly questions from the en banc bench, the RNC's counsel declined the opportunity to argue that the level of involvement between the RNC and the candidate with respect to the Cao ad did not amount to coordination. More broadly stated, counsel for the RNC refused to adopt the position that the level of coordination should affect whether an expenditure may be regulated. Instead, counsel steadfastly insisted that the proposed expenditure was coordinated and that his sole argument was that Congress could not regulate the RNC's "own speech." For example, the following exchange occurred at oral argument:

| Judge Jolly: | . . . [Y]our own argument is that as long as it is your speech, there are no further concerns about it. Is that . . . |
|---|---|
| Plaintiffs' Counsel: | That is correct. |
| Judge Jolly: | But, on the other hand, you have admitted also that if you run it and it becomes, you run it so often and so much and with such degree of coordination that it becomes their speech. |
| Plaintiffs' Counsel: | No, the degree of coordination does not affect whose speech it is at all. |

---

[20] *See* Plaintiffs-Appellants Brief at 11–25. The Plaintiffs' state in their brief that "[in this certified question], Plaintiffs-Appellants challenged whether a party's 'own speech' may be deemed a contribution." *Id.* at 11. "A political party's 'own speech' is speech that is *attributable* to it, even if input on the speech—as to details such as content, media, and timing—was received from others, such as a party's media consultants, script writers, pollsters, officials, constituency, ideological allies, and candidates." *Id.* at 16 (footnote omitted). "Attribution belongs to the entity that pays for and adopts the speech." *Id.* "*Cao Ad* is clearly RNC's own speech because it would be attributable to RNC and bear a disclaimer showing that RNC paid for the ad." *Id.* at 17. This "own speech" argument is the sole argument Plaintiffs make to the en banc court on this issue.

No. 10-30080, No. 10-30146

| | |
|---|---|
| Judge Jolly: | In other words, you can sit down and discuss with them the degree of coordination on fifty ads, and you can keep running that ad and running that ad on their time, and it, and you are running a number of ads, and it still is your speech notwithstanding the "Nth" degree of coordination that you have in running them? |
| Plaintiffs' Counsel: | That's right.  There is no degree of being pregnant.  You're either or not. |

Thus the record unambiguously reflects that the RNC's sole challenge in this case with regard to the Cao ad is whether Congress may regulate a party's own speech, meaning speech that is paid for by the party and adopted by the party regardless of coordination with the candidate.  We therefore examine only that argument.

To evaluate the merit of the Plaintiffs' expansive "own speech" argument, we return to *Buckley v. Valeo*, the first case to discuss coordinated expenditures under FECA.  In *Buckley*, the Supreme Court examined, *inter alia*, then-18 U.S.C. § 608(e)(1) which limited individuals' ability to make independent expenditures.[21] 424 U.S. at 39–51. The Government argued that Congress could restrict independent expenditures because independent expenditures could be used to circumvent contribution limits.  The *Buckley* Court rejected the Government's argument.  In finding that independent expenditures could not be regulated, the Court compared § 608(e)(1) with § 608(b), the provision that regulated expenditures coordinated with a candidate. The *Buckley* Court stated:

> . . . [C]ontrolled or coordinated  expenditures are treated as contributions rather than expenditures under the Act.  Section

---

[21] By its terms, § 608(e)(1) did not apply to national political parties.  Since *Buckley*, § 608(e)(1) has been repealed and replaced with similar provisions in 2 U.S.C. § 441a.

608(b)'s contribution ceilings rather than § 608(e)(1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions. By contrast, § 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign. Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.

*Id.* at 46–47 (footnote omitted). Thus, the *Buckley* Court concluded that although Congress was unable to regulate individuals' independent expenditures, Congress could regulate individuals' coordinated expenditures.

Building on and embracing its analysis in *Buckley*, the Court in *Colorado I* and *Colorado II* further examined the limitations on coordinated and independent expenditures as applied to political parties. In *Colorado I*, the Colorado Republican Party ("CRP") brought an as-applied challenge to the Party Expenditure Provision arguing that restricting a party's independent expenditures was unconstitutional. The *Colorado I* Court followed the *Buckley* rationale and found that "the constitutionally significant fact . . . is the lack of coordination between the candidate and the source of the expenditure." *Colorado I*, 518 U.S. at 617. In holding that the restraint on an independent expenditure was unconstitutional, the Court distinguished between coordinated expenditures and independent expenditures, stating:

. . . [T]he Court's cases have found a "fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate to be spent on his campaign." . . . [R]easonable contribution limits directly and materially advance the

> Government's interest in preventing exchanges of large financial contributions for political favors.
>
> . . . [L]imitations on independent expenditures are less directly related to preventing corruption, since "the absence of prearrangement and coordination of an expenditure with the candidate . . . not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate."

*Id.* at 614–16 (citations omitted). Thus, the *Colorado I* Court found that the Party Expenditure Provision was unconstitutional as applied to the CRP's independent expenditures.

In *Colorado I*, the CRP also raised a facial challenge to the application of the Party Expenditure Provision to coordinated expenditures. *Id.* at 623. The *Colorado I* Court remanded this facial challenge because the lower courts had not considered the issue. *Id.* at 625. The remanded issue of whether Congress could restrict coordinated expenditures reached the Supreme Court five years later as *Colorado II*. After analyzing its precedents in *Buckley* and *Colorado I*, the *Colorado II* Court found that "a party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of contribution limits." 533 U.S. at 465. In examining whether coordinated expenditures could be restricted, the Court applied the intermediate scrutiny standard announced in *Buckley*: the restriction must be closely drawn to match a important government interest. *Id.* at 456. The Court found that Congress could regulate coordinated expenditures as contributions because of the sufficiently important governmental interest in preventing the potential for political corruption by circumvention of campaign finance laws. *Id.* at 459–60. The Court stated:

> There is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate, and there is good reason to expect that a party's right of

25

unlimited coordinated spending would attract increased contributions to parties to finance exactly that kind of spending. Coordinated expenditures of money donated to a party are tailor-made to undermine contribution limits. Therefore the choice here is not, as in *Buckley* and *Colorado I*, between a limit on pure contributions and pure expenditures. The choice is between limiting contributions and limiting expenditures whose special value as expenditures is also the source of their power to corrupt. Congress is entitled to its choice.

*Id*. at 464–65 (footnotes omitted).

Though the *Colorado II* Court unambiguously found the application of the Party Expenditure Provision to coordinated expenditures to be facially constitutional, the Plaintiffs argue that "*Colorado II* expressly left open the as-applied question of whether parties' own speech may be limited as contributions." Plaintiffs-Appellants' Brief at 12 (footnote omitted). This argument is based on a footnote in the majority opinion of *Colorado II* that states:

Whether a different characterization, and hence a different type of scrutiny, could be appropriate in the context of an as-applied challenge focused on application of the limit to specific expenditures is a question that, as JUSTICE THOMAS notes, we need not reach in this facial challenge.

The Party appears to argue that even if the Party Expenditure Provision is justified with regard to coordinated expenditures that amount to no more than payment of the candidate's bills, the limitation is facially invalid because of its potential application to expenditures that involve more of the party's own speech. But the Party does not tell us what proportion of the spending falls in one category or the other, or otherwise lay the groundwork for its facial overbreadth claim.

533 U.S. at 456 n.17 (citations omitted). The Plaintiffs further rely on Justice Thomas' dissent, in which he states:

To the extent the Court has not defined the universe of coordinated expenditures and leaves open the possibility that there are such

> expenditures that would not be functionally identical to direct contributions, the constitutionality of the Party Expenditure Provision as applied to such expenditures remains unresolved. At oral argument, the Government appeared to suggest that the Party Expenditure Provision might not reach expenditures that are not functionally identical to contributions.

*Id.* at 469 n.2 (Thomas, J., dissenting).

Assuming that the *Colorado II* Court left open the possibility for an as-applied challenge to the Party Expenditure Provision's application to coordinated spending, the facts and arguments in the instant case do not present this court with that question. Acceptance of the Plaintiffs' "own speech" argument would effectively eviscerate the Supreme Court's holding in *Colorado II*, which dealt only with coordinated expenditures. The Court in *Colorado II* expressly recognized that Congress has the power to regulate coordinated expenditures in order to combat circumvention of the contribution limits and political corruption. *Id.* at 456 (majority opinion) ("We accordingly apply to a party's coordinated spending limitation the same scrutiny we have applied to the other political actors, that is, scrutiny appropriate for a contribution limit, enquiring whether the restriction is 'closely drawn' to match what we have recognized as the 'sufficiently important' government interest in combating political corruption."). The *Colorado II* Court stated:

> . . . [T]he question is whether experience under the present law confirms a serious threat of abuse from the unlimited coordinated party spending as the Government contends. It clearly does. Despite years of enforcement of the challenged limits, substantial evidence demonstrates how candidates, donors, and parties test the limits of the current law, and it shows beyond serious doubt how contribution limits would be eroded if inducement to circumvent them were enhanced by declaring parties' coordinated spending wide open.

*Id.* at 457 (citation and footnote omitted).

27

If this court were to accept the Plaintiffs' exceedingly broad argument, we would be reaching a conclusion inconsistent with the *Colorado II* Court's teaching that coordinated expenditures may be restricted. The RNC's sole argument throughout has been that there is no limit to its claim that Congress cannot regulate a party's own speech regardless of the degree of coordination with the candidate. The district court succinctly identified the Plaintiffs' argument: "Plaintiffs claim that a party coordinated communication disclosed as paid for by the party is the party's 'own speech' even if a candidate indicates in the communication that he has approved the message." *Cao* (*District Court*), 688 F. Supp. 2d at 531. Moreover, "Plaintiffs claim that a party coordinated communication disclosed as having been paid for by the party is the party's 'own speech' even if the candidate or her campaign actually creates the communication and passes it along to the party." *Id.* at 530. Thus, under the Plaintiffs' standard, all coordinated expenditures paid for and adopted by the party would be considered a party's own speech and not subject to restriction.[22] As demonstrated above, the *Colorado II* Court, as well as the Court's earlier cases, clearly held that coordinated expenditures may be restricted to prevent circumvention and corruption.

We find the *Colorado II* Court's concern with corruption particularly important since, in the present case, the Plaintiffs admit that they themselves have already taken steps to circumvent the Act's individual donor contribution limits. The district court found that "[t]he RNC encourages its candidates to tell their 'maxed out' donors to contribute to the RNC." *Cao* (*District Court*), 688 F. Supp. 2d at 526. Representative Cao confirmed in his deposition this behavior

---

[22] The district court stated that "[t]he only type of party-coordinated communication that plaintiffs believe is not a party's 'own speech' and therefore may be constitutionally limited is one that a campaign airs and for which the party merely pays the bill." *Cao*, 688 F. Supp. 2d at 531. However, under Plaintiffs' argument even this type of communication would be considered the party's own speech if the party adopted the ad as its own.

by the RNC. "Congressman Cao has personally suggested to donors who had given the maximum amount to his campaign that they could also contribute to the party." *Id.* Furthermore, the district court found that "the party has shared [its] donor list" with its federal candidates, and that "[t]he sharing of information also happens in the other direction[, since the party] receives information from federal candidates about who has contributed to their campaigns." *Id.* at 523. The district court also found that "the RNC organizes 'fulfillment' events to which individuals who have made a large contribution to the RNC of a specified amount are invited" so that they can have special access to federal lawmakers.[23] *Id.* The *Colorado II* Court warned that "[i]f the effectiveness of party spending could be enhanced by limitless coordination, the ties of straitened candidates to prosperous ones and, vicariously, to large donors would be reinforced as well." *Colorado II*, 533 U.S. at 460 n.23. The above facts demonstrate the potential corruption and abuse that concerned *Colorado II*. *Id.* at 456. At oral argument, the en banc court gave counsel every opportunity to address the concern that the Plaintiffs' argument conflicts with the Supreme Court's controlling precedent.[24]

---

[23] The district court found the following:

> The RNC has created tiers of donors with specified benefits based on levels of annual giving: For example, donors who give $15,000 receive intimate luncheons, dinners, and meetings with key policymakers; donors who give $30,400 enjoy exclusive private functions with elected Republican leaders; and donors who commit to raising $60,800 receive at least one . . . exclusive event during the year, as well as other intimate events with key GOP policymakers.

*Cao (District Court)*, 688 F. Supp. 2d at 523 (internal quotation marks omitted).

[24] Chief Judge Jones questioned RNC's counsel in this regard:

> [T]he Court has always very often said 'well, coordinated expenditures are different.' Now they haven't delineated the line between speech and coordination, but it seems to me you are trying to pretty much shatter that barrier. And the second thing is, *Colorado I* would have been decided in the way that you advocate if the Court had accepted your position. So what has changed since *Colorado I*?

In response, Plaintiffs' counsel reiterated that the challenge was an as-applied challenge, whereas *Colorado II* was a facial challenge. *Colorado II*, the Plaintiffs assert, left open the possibility of their as-applied challenge.

*Colorado II* certainly left open the possibility for an as-applied challenge to the Party Expenditure Provision as it applies to coordinated expenditures; it is well-established that the facial upholding of a law does not prevent future as-applied challenges. *E.g.*, *Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411–12 (2006) (holding that the plaintiff could bring an as-applied challenge to BCRA despite the Court upholding the statute on its face). However, simply characterizing the challenge as an as-applied challenge does make it one. "While rejection of a facial challenge to a statute does not preclude all as-applied attacks, surely it precludes one resting upon the same asserted principle of law." *Penry v. Lynaugh*, 493 U.S. 302, 354 (1989) (Scalia, J., dissenting). *See also* *RNC v. FEC*, 698 F. Supp. 2d 150, 157 (D.D.C. 2010) ("In general, a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision. Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent."), *summ. aff'd*, *RNC v. FEC*, 130 S. Ct. 3543 (2010).

The argument raised by the Plaintiffs in this case rests not on a sufficiently developed factual record, but rather, on the same general principles rejected by the Court in *Colorado II*, namely the broad position that coordinated expenditures may not be regulated.[25] Finding for the Plaintiffs would require us to hold that Congress cannot limit a party's expenditures on a campaign ad, the content of which the party adopts, regardless of the degree of coordination with

---

[25] The Plaintiffs' Second Amended Complaint raises further concern that this is merely an attempt to overturn *Colorado II* because the Plaintiffs chiefly rely on the rationale of the *Colorado II* dissenting opinion. *See* Second Amended Complaint, ¶¶ 43–44, 83–85.

the candidate.[26]    Because such a conclusion would effectually overrule all restrictions on coordinated expenditures, the RNC's argument must fail in light of *Colorado II.*

The Plaintiffs further argue that the Court's recent decision in *Citizens United* has signaled a change in the law in this area.  Undoubtedly, *Citizens United* altered the legal landscape with respect to corporations and labor unions, because the Supreme Court held that these entities may make independent campaign expenditures free of Congressional limitations.  *See* 130 S. Ct. at 913.  However, as we discussed earlier, the Supreme Court's decision in *Citizens United* has no bearing on whether Congress has the power to restrict political parties' *coordinated* expenditure*s*.  *Citizens United* addresses only independent expenditures and simply does not address coordinated expenditures.  Regardless, the holding of *Citizens United*—that the restrictions on independent expenditures by corporations and labor unions violated the First Amendment—is entirely consistent with the Court's decision in *Colorado I*, in which the Court held that Congress could not regulate the independent expenditures of a party.  *See Colorado I*, 518 U.S. at 617.  Thus, as we have previously stated, there is no reason for us to conclude that *Citizens United* undermines *Colorado II*'s holding that Congress can regulate a party's coordinated expenditures.[27]

_____

[26] Chief Judge Jones posits that we conclude the Cao Ad is a "coordinated" expenditure simply because the government claims it is.  She writes: "This court is not bound by the government's simply labeling the speech 'coordinated' . . . . 'An agency's simply calling an independent expenditure a "coordinated expenditure" cannot (for constitutional purposes) make it one.'" Jones Dissent at 17 (quoting *Colorado I*, 518 U.S. at 621–22).  True enough.  We note, however, that we are not relying on the government's claim that the Cao Ad is coordinated, but rather, we place our reliance on the Plaintiffs' admissions as to the extent of the coordination and Plaintiffs' labeling of their own claim.  Notably, in their Rule 28(j) letter to the court, the Plaintiffs once again confirmed that the proposed Cao Ad amounted to coordination: "RNC provides a specific ad, a specific coordinating candidate, and specific detail as to coordination nature (timing, with content awareness)."

[27] *See also RNC v. FEC*, 698 F. Supp. 2d at 153 (noting that *Citizens United* did not disturb prior decisions that found limits on contributions to political parties to be

The Plaintiffs have offered much rhetoric regarding the Party Expenditure Provision's "suppression" of their speech, yet as the district court noted in its factual findings, "party committees like the RNC rarely reach their legal limit for coordinated expenditures in a particular House or Senate race." *Cao* (*District Court*), 688 F. Supp. 2d at 520.[28]  Overall, "[i]n the 2008 election cycle, the major national party committees (RNC and DNC) supported their federal candidates with a total of $529,262 in contributions, $31,256,379 in coordinated expenditures, and $54,563,499 in independent expenditures." *Id.* at 517.  Thus, the Party Expenditure Provision hardly amounts to a ban on free speech. Instead, the Act's cap on coordinated expenditures seems a small price to pay to preserve "the integrity of our system of representative democracy." *Buckley*, 424 U.S. at 26.

The Plaintiffs' "own speech" argument cannot be reconciled with *Colorado II*.  As such, we find that the expenditure and contribution limits and contribution provision in 2 U.S.C. §§ 441a(a)(2)–(3), 441a(a)(2)(A), and 441a(a)(7)B)(I) do not violate the First Amendment rights of one or more of the Plaintiffs as applied to coordinated communications that convey the basis for the party's expressed support.

IV.

The principal disagreement we have with the dissents is over the scope of Plaintiffs' argument with respect to the constitutionality of contribution restrictions relative to coordinated expenditures.  Based on the record, briefs and oral argument, we have explained above why we conclude that the only issue Plaintiffs presented to us for decision is whether the RNC's "own speech" is

constitutional).

[28] "Although there are at least 468 federal elections each cycle, Republican committees reached the maximum amount of coordinated expenditures in only seven congressional races in 2008, and in two races in 2006." *Cao* (*District Court*), 688 F. Supp. 2d at 520.

subject to regulation and restriction under FECA. As we read Chief Judge Jones's dissent, she agrees that *Colorado II* answers this question and authorizes regulation of RNC's own speech generally. Chief Judge Jones's principal argument is that Plaintiffs also presented for decision whether the Act can constitutionally restrict expenditures for the Cao Ad involved in this case when that ad was coordinated between the RNC and the candidate as to "timing only."

Contrary to the position outlined above, Chief Judge Jones's dissent asserts first that the Plaintiffs raised this latter "narrow" issue in its brief. To support this assertion, Chief Judge Jones relies on two sources in Plaintiffs' briefs. First, she relies on recitations of Joint Stipulation of Fact ¶ 32, which states that "RNC intends to coordinate the *RNC Cao Ad* with Joseph Cao as to the best timing for the *Ad*, but otherwise the *Ad* would not be coordinated with Cao." The recitation of a stipulation of fact does not present an issue on appeal. The only other passage in the Plaintiffs' briefs that the Chief Judge relies on to support her view that Plaintiffs wish to present this as an issue on appeal is in a footnote in the Plaintiffs' reply brief. The law is clear in this circuit that we do not consider arguments made for the first time in an appellant's reply brief. *Woods v. Johnson*, 75 F.3d 1017, 1035 n. 24 (5th Cir. 1996) ("[W]e do not consider issues raised for the first time in a reply brief."); *Cavallini v. State Farm Mt. Auto Ins. Co.*, 44 F.3d 256, 260 n. 9 (5th Cir. 1995); *see also Cinel v. Connick,* 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.") (citing *Villanueva v. CNA Ins. Cos.*, 868 F.2d 684, 687 n. 5 (5th Cir. 1989)). Moreover, we read this footnote as an attempt by Plaintiffs to explain the legal question *Colorado II* left open, particularly Justice Thomas' view of the open question which he articulated in his dissent. This passage notes that *Colorado II* left open "whether some other speech communications may not be regulated because coordination is de minimis

(e.g., just timing) . . ." *See* Jones Dissent at 5-6 (citing footnote 5 in Plaintiffs-Appellants' Reply Brief). Plaintiffs, however, make no argument that coordination of the Cao Ad (with timing plus knowledge of content) is *de minimis*. Notably, this is the only passage referring to "*de minimis*" coordination in either of Plaintiffs' briefs. That Plaintiffs never intended to make the *de minimis* argument is further supported by the fact (as we will discuss below) that counsel repeatedly disclaimed an intent to raise this narrow issue on appeal.

Even if we accept that the argument in Plaintiffs' reply brief properly raised this issue for our consideration, it is clear to us that counsel for Plaintiffs at oral argument abandoned this issue. We have quoted at length above counsel's persistent disclaimers that he is relying on the fact that the coordination between the candidate and the party was *de minimis*. He consistently argues that once the speech is determined to be the party's "own speech," then regulation or restrictions on that speech is unconstitutional. All of the responses given by counsel to questions from the court disclaiming that he is making this narrow argument cannot be explained as agreeing that the Cao Ad may amount to coordination under the regulation but failing to concede that the Cao Ad amounts to coordination for purposes of our constitutional analysis of Plaintiffs' claim. *See* Jones Dissent at 8 n. 5.

Even if we further consider that Plaintiffs made and did not abandon the argument that the coordination between the candidate and the party was *de minimis,* based on the stipulation and admission of counsel the coordination cannot be considered *de minimis*. At oral argument, Plaintiffs' counsel conceded that the RNC intended to coordinate the Cao Ad with Cao not only with regard to timing, but *also* by providing Cao with advance knowledge of the Cao Ad's

content.[29]    Plaintiffs' counsel expressly repeated this concession in a supplemental Rule 28(j) letter filed with the court after oral argument stating that "RNC provides a specific ad, a specific coordinating candidate, and *specific detail as to coordination nature (timing, with content awareness).*" (emphasis added).[30]  These concessions by counsel are consistent with the allegations of the Plaintiffs' Second Amended Complaint, which recites the specific text of the Cao Ad, necessarily indicating that Plaintiffs intended to provide Cao with advance knowledge of the Cao Ad's content.  *See* Second Amended Complaint ¶ 44.[31]

This "content awareness" stipulation has significance that the dissents completely overlook.  For instance, given advance knowledge of the Cao Ad's content, if Cao approved of the content and found it favorable to his campaign, he may have told or requested the RNC to run the ad frequently during prime hours.  If Cao disapproved of the Cao Ad's content and found it unfavorable to his campaign, he may have told or requested the party to run it infrequently during off hours, or perhaps not at all.  This degree of coordination of campaign expenditures contrasts sharply with the Supreme Court's functional definition of independent expenditures.  Whereas the Supreme Court has explained that an independent expenditure representing the party's own views may at times

---

[29] Upon questioning by Judge Owen, counsel stated "I think that is part of the facts, that they knew what the *Cao Ad* said," and again confirmed that content knowledge is "part of the fact pattern."

[30] FEC counsel's own supplemental Rule 28(j) letter to the court correctly observed that the admission by Plaintiffs' counsel at oral argument "clarified for the first time that Cao not only planned to coordinate as to timing, but also would be aware of the content of the advertisement."

[31] The full text of the Cao Ad appearing in the Second Amended Complaint also appears in ¶ 43 of Plaintiffs' First Amended Complaint filed December 4, 2008, two days before the election.  Thus, Cao knew of the Cao Ad's content at least two days before the election, and if relief had been immediately granted the coordination would have taken place with his knowledge of the Cao Ad's content.

work against the candidate's interests,[32] timing-plus-content-awareness coordination may ensure that a party's message virtually always works in the candidate's favor.[33] *See Buckley*, 424 U.S. at 47; *Colorado II*, 533 U.S. at 464.

For these reasons we cannot agree with Chief Judge Jones's conclusion that "there is no functional difference between the Cao Ad and a constitutionally protected independent expenditure." Jones Dissent at 20. As we have explained above, knowledge of content plus timing coordination makes a huge difference relative to the benefit of the ad to the candidate that the dissent fails to recognize—namely, the candidate's ability to direct approved content for maximum impact and redirect disapproved content for minimum impact on his campaign.[34]

This type of coordinated activity, moreover, implicates the same corruption and circumvention concerns of the *Colorado II* Court. As discussed above, the court is particularly concerned with Plaintiffs' admissions that they have already taken steps to circumvent the Act's individual donor contribution limits.

---

[32] Cao's experience with the RNC's previous independent expenditures confirms this distinction. He testified that some of the RNC's prior independent expenditures harmed his election chances. Deposition of Anh "Joseph" Cao ("Cao Dep.") at 42 (FEC Exh. 4 to Proposed Findings of Fact).

[33] This is consistent with Cao's understanding of the nature of the intended coordination. At deposition, he testified as to the following:

> I would like to know the contents of those ads . . . . And so if we were allowed to coordinate it with them, I would have loved to have their fundings and their support and – and to basically coordinate how the ads should be read or – what the ads should say. What our focus – what we want to focus on.

Cao Dep. at 42.

[34] Consideration of the "content awareness" element of Plaintiffs' allegations demonstrates the error in many of the dissents' conclusions, including Chief Judge Jones's assertions that "[t]here is no evidence that he or his campaign . . . provided their views on its content," that "[t]he candidate will not know whether the ad is effective," and that "[c]ontent, however, is not at issue in this case." Jones Dissent at 5, 20, 27.

Furthermore, to quote Judge Clement's dissent, if Cao were asked "to provide input on its content" or "asked to provide his consent to run the ad . . . that would indeed raise a suspicion that the parties were attempting to circumvent the rules against coordination so that the RNC could pay the bill for *Cao's* speech—the evil at which the coordination rules are aimed." Clement Dissent at 3. This is exactly the scenario that is contemplated by the coordination of timing with the addition of advance content awareness, which both dissents refuse to acknowledge. Therefore, based on what we know of the extent of the proposed coordination on this scant record, it is reasonable to infer that the coordination of the Cao Ad between the candidate and the party as to timing with the candidate's prior knowledge of the of the ad's content would amount to a coordinated expenditure subject to restriction under *Colorado II*.

In the absence of additional facts as to the actual extent of the coordination, all the Court is left with is the obligation to give reasonable inferences to the evidence that was produced. And it is the Plaintiffs' burden in an as-applied challenge of this nature to produce the facts upon which he bases his challenge. *Khachaturian*, 980 F. 2d at 331. In other words, a plaintiff seeking an injunction in an as-applied challenge generally has the burden to allege enough facts for the Court to decide the constitutional claim while avoiding "'premature interpretation of statutes'" requiring speculation or conjecture on a "'factually barebones record.'" *Milavetz, Gallop & Milavetz, P.A. v. United States,* 130 S. Ct. 1324, 1344 (2010) (Thomas, J., concurring in part and concurring in the judgment) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008)). The Supreme Court "generally disapprove[s] of such challenges." *Id*. "When forced to determine the constitutionality of a statute based solely on such conjecture, we

will uphold the law if there is any 'conceivable' manner in which it can be enforced consistent with the First Amendment." *Id*. at 1345.[35]

In sum, we are satisfied that the *de minimis* coordination issue was not presented to the court for decision. Indeed, we find it strange that the dissents take an argument not made in the district court, nor presented to us on appeal—and wholly disavowed by Plaintiffs' counsel during oral argument—and attempt to raise it like a Phoenix from the ashes. However, as a court comprised of Article III judges, our role is not to create arguments for adjudication—but rather, our role is to adjudicate those arguments with which we are presented. Thus, we should decline the dissents' invitation to serve as advocates for the Plaintiffs and arbiters of our own engendered claims. Nonetheless, for the sake of completeness, even if the court were to conclude that this issue was presented, it is clear to us that an expenditure for an ad advocating the election of the candidate coordinated as to timing, when the candidate has knowledge of the content of the ad, amounts to a coordinated expenditure that may be constitutionally regulated under *Colorado II*.

We also disagree with the position advocated by Chief Judges Jones and Judge Clement that the *WRTL* analysis applies to this case. In *WRTL*, the Court considered whether the government could regulate an independent expenditure under § 203 of BCRA for payment of an "issue advocacy" ad. 551 U.S. at 455. No question was raised that the ad was coordinated with the candidate. The Court applied strict scrutiny to the statute and held that BCRA as applied to this ad did not pass constitutional muster. This holding is not inconsistent with *Buckley, Colorado I,* and *Colorado II*, all of which make it clear

---

[35] This is especially true in the context of a preenforcement as-applied action. *Id.; see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2722 (2010) (Denying a preenforcement as-applied First Amendment challenge to the material support provisions of federal anti-terrorism law because plaintiffs did not provide any "specific articulation of the degree to which they seek to coordinate their advocacy.").

that strict scrutiny applies to regulation of independent expenditures for political speech.[36]

V.

For the foregoing reasons, we answer the questions certified to the en banc court as follows. First, the Plaintiffs do have standing to bring their claims. Second, § 441a(a)(2)(A)'s $5,000 contribution limit is constitutional even though it imposes the same limits on parties as on PACs and is not adjusted for inflation. Third, §§ 441a(a)(2)–(3), 441a(a)(2)(A), and 441a(a)(7)(B)(i) are not unconstitutional as applied to the Plaintiffs. Moreover, we find that the district court did not abuse its discretion in dismissing the frivolous claims. Accordingly, we remand this case to the district court for entry of judgment consistent with this opinion.

---

[36] Under *WRTL*, it is clear that the Cao Ad is an express advocacy ad. The Cao Ad affirmatively asks the reader to join the party in supporting Cao on election day. This meets the requirements of an express advocacy ad. *See WRTL*, 551 U.S. at 469. Additionally, the Plaintiffs' themselves characterize the Cao Ad as "a specific express advocacy communication that RNC intends to make . . . ." Joint Stipulation of Facts ¶ 31.

E. GRADY JOLLY, Circuit Judge, concurring in result:

I concur in the result reached by the majority because I agree that it reflects the more accurate and realistic way the case has been presented for decision. There is much to admire in Chief Judge Jones's dissent, and if I agreed that the argument she addresses was the question that plaintiffs were actually presenting for decision, I would concur in her opinion. Judge Clement has written clearly but broadly. In my view, she does not merely challenge the statute's express provisions that effectively bar a Party from coordinating its efforts with the campaign of a candidate, but also the Supreme Court's ruling that essentially upholds this provision. Both she and Chief Judge Jones ultimately may be correct. But, in my opinion, not today.

EDITH H. JONES, Chief Judge, with SMITH, CLEMENT, ELROD, and HAYNES, Circuit Judges concurring in part and dissenting in part:

The first object of the First Amendment is to protect robust political debate that underpins free citizens' ability to govern ourselves. "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. . . . The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. FEC*, __ U.S. __,130 S. Ct. 876, 898 (2010) (internal citations and quotations omitted). Yet the majority hold that Congress may forbid a political party from broadcasting an advertisement explaining why the party supports its own congressional candidate merely because the advertisement was coordinated with the candidate as to timing.

We dissent. The Cao Ad cannot be suppressed by the FEC on the facts before us.[1]

The majority's errors are procedural as well as substantive. Taking a most unorthodox approach to First Amendment adjudication, they assert that the "sole" issue before the court is "whether Congress may regulate a party's own speech, meaning speech that is paid for by the party and adopted by the

---

[1] While this dissent considers the narrow issue whether timing-only coordination of a political party's campaign speech with the candidate it supports may be prohibited by the FECA, Judge Clement's opinion carries the implications of recent Supreme Court decisions further to protect political party "speech that is not the functional equivalent of a campaign contribution." Our approaches are harmonious, reflecting different levels of generality.

41

party regardless of coordination with the candidate." This is not the "sole" issue. The record clearly presents a narrower controversy—timing-only coordination. The majority opinion ignores the stipulated facts and argument presenting the Cao Ad dispute just as it ignores the FEC's concession in oral argument that this dispute touches the outer boundary of the agency's regulatory authority. The usual path of constitutional adjudication is first to consider the fact-based issue and to reach broader constitutional questions only if they are inescapably presented. *Citizens United*, __ U.S. __, 130 S. Ct. at 918 (Roberts, C.J., concurring). The majority stand this tradition on its head.

Substantively, the majority analysis, flawed by its overbroad premises, ultimately begs the primary question before us—at what point does "coordination" between a candidate and a political party transform the party's communicative speech into a mere "contribution" subject to strict dollar limits? This question was left open by the Supreme Court. *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 456, n.17, 121 S. Ct. 2351, 2366 n.17 (2001) ("*Colorado II*"). In light of subsequent Supreme Court decisions, courts must begin to deal with it.[2]

---

[2] The majority "reads" this dissent as agreeing that *Colorado II* "authorizes regulation of RNC's own speech generally." Not so. We read *Colorado II* to acknowledge that expenditures coordinated between a party and a federal candidate range along a spectrum of expressiveness — less-"expressive" party donations like copying equipment clearly fall within the coordinated expenditure limits. More expressive forms of support by the party, however, enjoy stronger constitutional protection. The FEC itself admitted that the Cao Ad lies along

No. 10-30080, No. 10-30146

Because the majority fail to join issue with the stipulated facts, their opinion cannot defend against the party's as-applied challenge to 2 U.S.C. §§ 441a(d)(2), (3), and (a)(2)(A). But for the issue of "coordination" with the candidate as to its broadcast, the Cao Ad would be speech by the RNC fully protected by the First Amendment. *Cf. FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 467, 127 S. Ct. 2652, 2665 n.4 (2007) ("*WRTL*"); *Citizens United*, __ U.S. __, 130 S. Ct. at 908-10. In this as-applied challenge, the government had the burden to show that this expressive but minimally coordinated speech may be subjected to the strict limits reserved for monetary contributions. *WRTL*, 551 U.S. at 467, 127 S. Ct. at 2665 n.4. I conclude, after performing the necessary analysis, that the government may not infringe the party's right to speak in this manner.

The foregoing propositions are elaborated in three steps. First, I will restate the obvious, that a narrower, fact-based challenge was presented to the court. Second, according to well settled precedent, the narrower issue ought to be decided. Third, I address the as-applied challenge on its merits, placing the burden on the government.[3]

## I.    A Narrow Fact-Based Challenge Is Before The Court

---

the expressive side of the spectrum

[3] I concur in the rest of the majority opinion because the other issues are controlled by Supreme Court authority. This dissent concerns the majority's disposition of certified questions 3 and 6.

43

No. 10-30080, No. 10-30146

The majority state that "the record unambiguously reflects that the RNC's sole challenge in this case with regards to the Cao Ad is whether Congress may regulate a party's own speech, meaning speech that is paid for by the party and adopted by the party regardless of coordination with the candidate." Indeed, the majority devote nearly as much discussion to justifying their "sole challenge" approach as they do to rejecting the challenge. Despite the majority's contentions, the court is obliged to address the facts that have actually been presented— specifically, whether this particular ad can be regulated as a *de facto* contribution even though the coordination regarded solely the timing of its broadcast.[4]

It is important to stress just how minimal was the level of coordination. When the Supreme Court has interpreted the term "coordinated expenditures," it described a spectrum, at one end of which political parties would simply foot the candidate's bills. *Colorado II*, 533 U.S. at 439, 460, 121 S. Ct. at 2357, 2368. The present scenario stands at the other end. The Republican Party sought to broadcast this ad supporting Congressman Cao before the 2008 election:

---

[4] Responding to these facts, the majority contends that (a) Cao's counsel really disclaimed the narrower approach taken by this dissent and (b) counsel conceded not only timing but "content awareness" underlay the proposed coordination. This dissent responds fully to the former contention. As to the latter, after the past several years in litigation Cao would have to admit his awareness of the ad! In any event, it is the assertion of "content awareness" that first appeared in en banc oral argument and post-argument briefing. Timing-only is the only stipulation in the district court and therefore the only "fact" before us.

44

Why We Support Cao

The Republican National Committee has long stood for certain core principles, which we believe are the fundamentals of good government. When it comes to the issues of lower taxes, individual freedoms and a strong national defense, we need leaders who will stand with the American people and defend those issues.

We need leaders who understand that our economy is in a recession, our individual freedoms are constantly under attack and we continue to fight the global war on terrorism to keep our families safe.

Joseph Cao understands and fights for those issues. And, that is why we ask you to join us in supporting him on December 6. It's important for Louisiana and important for the country.

Stipulated Facts ¶ 31.

The ad was produced and approved by the RNC, on its own initiative, without any input from Cao. Cao and the RNC intended to cooperate only as to the timing of the ad. Timing constituted the only coordination. Stipulated Facts ¶ 32. There is no evidence that Cao suggested, instigated or requested the ad. There is no evidence that he or his campaign wrote it or provided their views on its content. There is no evidence that the ad might have caused Cao to spend his campaign funds any differently. Thus, whether or not such *de minimis* coordination allows the Cao Ad to be banned as a "coordinated expenditure" is before the court for decision.

The plaintiffs raised this precise issue in their briefing. They assert that "[i]f the degree [of coordination] matters, FEC must concede that as

45

applied to the Cao Ad coordination is *de minimis and non-cognizable.*"

(emphasis added).  Their contentions are best summed up as follows:

> The open question in *Colorado-II* asks both (a) whether some own-speech communications may not be regulated because coordination is *de minimis* (e.g., just timing) and (b) whether all such communications are too much like independent expenditures to be limited regardless of coordination degree. Under the former, degree matters and expenditures for the Cao Ad may not be treated as contributions. Under the latter, degree does not matter and none of RNC's proposed own-speech activities may be so treated.

Reply Brief, at 10.

Lest there be doubt, the plaintiffs' desire to run the Cao Ad without fear of prosecution or investigation permeates their initial brief to this court as it did their arguments in the district court.  The plaintiffs' statement of facts asserts: "Specifically, the RNC intended to make an expressive advocacy radio ad ('Cao Ad'), if legally permitted by the judicial relief sought in this case.  (R.278-79).  The RNC intended to coordinate the *Cao Ad* with Cao as to the best timing for it, but otherwise it would not be coordinated with Cao."[5]

Plaintiffs' brief goes on to explain their theory about the distinction between political contributions, which the Supreme Court has held are amenable to government regulation as symbolic expressions of political support, and expenditures, which the Court considers fully protected under the First Amendment because they "communicate the underlying basis for

---

[5] The majority opinion is simply inaccurate in asserting that plaintiffs raised an as-applied challenge only in their reply brief.

support." *See Buckley v. Valeo*, 424 U.S. 1, 19-21, 96 S.Ct. 612, 634-35 (1976).

The Federal Election Campaign Act treats all "coordinated expenditures" between third parties and their favored candidates as contributions, and therefore subject to rigid dollar limits.[6] Plaintiffs, however, would have this court acknowledge the constitutional protection of "coordinated expenditures" that represent communicative statements of their reasons for supporting a candidate. Thus, they asserted broadly in their brief that communicative activities attributable to and paid for by the RNC become its "own speech" irrespective of coordination with Cao. But they also more narrowly assert that the Cao Ad is attributable to the RNC:

> [The Cao Ad] communicates the underlying basis for support for the candidate and his views, *i.e.*, it is not merely symbolic expression of support. Coordination with Rep. Cao as to timing would in no way alter the fact that this ad would be RNC's own speech. The ad is plainly more in the nature of a party's own speech than in the nature of merely paying a candidate's bills. Disbursements for it would be expenditures, not contributions. They may not be limited as if they were contributions.

---

[6] Justice Souter explained in *Colorado II* that expenditures coordinated with a candidate are contributions under FECA:

> The simplicity of the distinction [between contributions and expenditures] is qualified, however, by the Act's provision for a functional, not formal, definition of "contribution," which includes "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents," 2 U.S.C. § 441a(a) (7)(B)(i).

*Colorado II*, 533 U.S. at 438, 121 S. Ct. at 2356-57.

No. 10-30080, No. 10-30146

Finally, plaintiffs' brief returns to the Cao Ad in the course of asserting

that the government cannot sustain its burden of justifying this limit on

coordinated expenditures that embody a party's political speech:

> Another reason it was difficult was that RNC couldn't have
> written the Cao Ad if it were an independent expenditure
> because, to create the necessary independence, "this would have
> had to have been made through an outside consultant . . . .
>
> At the time RNC wanted to speak through the Cao Ad, it was not
> practically possible to firewall off RNC staff in order to do an
> independent expenditure . . . .

For all the majority's quotations intended to support their

characterization of plaintiffs' broader argument as the "sole challenge,"

resting entirely on hypothetical grounds, there is not a word of waiver[7] by

plaintiffs of any ground of relief generated by their case.[8]  That plaintiffs' oral

---

[7] To waive an issue, a party must have "the intention of forgoing it."  BLACK'S LAW DICTIONARY (8th ed. 2004); *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.'"(quoting *United States v. Olano*, 507 U.S. 725, 773, 113 S. Ct. 1770, 1777 (1993))).

[8] The majority make too much of an exchange during oral argument in which plaintiffs' counsel stated that the Cao Ad was "coordinated."  The majority imply  that the plaintiffs conceded that the Cao Ad was a "coordinated expenditure" under *Colorado II,* and therefore *Colorado II* controls this case.  This is inaccurate.  When the plaintiffs stated that the Cao Ad was "coordinated," they were referring to the FEC regulations:

Judge Jolly:         In other words you can sit down and discuss with them the degree of coordination on fifty ads and you can keep running that ad and running that ad on their time.  And you're running a number of ads and still it's your speech notwithstanding the nth degree of coordination that you had.

Plaintiff's Counsel:   That's right. There's no degree of being pregnant. You're either or not, and **under their regulations**, it is . . . .

argument before this court is broadly phrased is hardly a novel tactic, especially when the line between facial and as-applied challenges to statutes is "not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United*, __ U.S. __, 130 S. Ct. at 893. The district court, however, was well aware that plaintiffs' object is to obtain a ruling that defines, or begins to define, where certain coordinated activities of the RNC with Congressman Cao lie along the spectrum running from "functional monetary contributions" to full-throated political advocacy.[9] The specifically defined activity here was the production and planned broadcast of the Cao Ad. Having raised this issue in the district court and to this court, the plaintiffs are entitled to an answer.

## II.   The Court Must Address Narrow Issues First

The majority hardly need reminding of the cardinal principle of constitutional adjudication that a court should address the case presented by

---

(emphasis added). Counsel conceded only FEC's regulatory interpretation of the consequences of timing-only coordination, not the constitutionality of that interpretation.

[9] Judge Berrigan's order cites both *Colorado II*'s majority opinion and Justice Thomas's dissent, explaining that several "coordinated" activities are not equivalent to *de facto* contributions, but instead are genuine expenditures with only a minimal amount of coordination. *Cao v. FEC*, 688 F. Supp. 2d 498, 539-540 (E.D. La. 2010). Relying on this discussion, the order rejects the FEC's motion for summary judgment, stating that "where a coordinated expenditure explicitly conveys that underlying basis, it arguably becomes less symbolic and begins to look more like a 'direct restraint on . . . political communication.'" *Id.* at 541 (quoting *Buckley*, 424 U.S. at 21, 96 S. Ct. at 636.)

49

the facts before it rather than broad, hypothetical scenarios.  Courts should

neither "anticipate a question of constitutional law in advance of the necessity

of deciding it" nor "formulate a rule of constitutional law broader than is

required by the precise facts to which it is to be applied." *Ashwander v. TVA*,

297 U.S. 288, 346-47, 56 S. Ct. 466, 483 (1936) (Brandeis, J.) (quoting

*Liverpool, N.Y. & Philadelphia Steamship Co. v. Emigration Commissioners*,

113 U.S. 33, 39, 5 S. Ct. 352, 355 (1885)); *Wash. State Grange v. Wash. State

Rep. Party*, 552 U.S. 442, 450-51 128 S. Ct. 1184, 1191 (2008).  Going beyond

our "case or controversy" limits spawns advisory opinions that are likely to be

ill-informed.

The majority opinion falls into this trap.  Rather than address the

stipulated facts about the Cao Ad, which have been fairly "passed upon" in

the parties' briefs and by the district court, the majority considers the

application of *Colorado II* to all "speech" "adopted by a political party."  The

majority propose an answer to the broadest possible question before the court,

extending the reach of their decision well beyond the factual record.  Their

overbroad approach leads to at least one serious mistake as they conflate the

plaintiffs' "own speech" argument with every conceivable "expenditure" whose

"coordination" is deemed by FECA to be the functional equivalent of a simple

monetary contribution.  Thus, they conclude, adopting the "own speech"

argument would "effectively overrule" the Supreme Court's decision in

50

No. 10-30080, No. 10-30146

*Colorado II* that facially upheld dollar limits on coordinated expenditures.

This is plainly wrong.

The Supreme Court,[10] the district court,[11] the plaintiffs [12] and the FEC[13]

all recognize that "coordinated expenditures" range on a spectrum from those

that are more independently communicative of a supporter's views to those

more like money contributions, which *Buckley v. Valeo* characterizes as mere

symbolic expression. The majority employs a meat cleaver instead of a

scalpel in the most sensitive constitutional area of political speech.

---

[10] *Colorado II*, 533 U.S. at 445, 121 S. Ct. at 2360 ("Coordinated spending by a party, in other words, covers a spectrum of activity, as does coordinated spending by other political actors."); *Id*. at 467-68, 121 S. Ct. at 2372-73 (Thomas, J. dissenting) ("This definition covers a broad array of conduct, some of which is akin to an independent expenditure.").

[11] *Cao*, 688 F. Supp. 2d at 539-540.

[12] Appellants' Reply Brief, at 10.

[13] The FEC conceded that the Cao Ad would be at the outer reaches of the FEC's regulatory authority:

| | |
|---|---|
| Judge [Clement]: | Where do you think the Cao ad falls on the spectrum of coordinated expenditures, with respect to first amendment rights? |
| FEC Counsel: | Well, I think in terms of- |
| Judge [Clement]: | Is it within the heartland or is it- |
| FEC Counsel: | I think it's towards the outer boundary, because timing is- |
| Judge [Clement]: | Which outer boundary? |
| FEC Counsel: | The outer boundary of what would be regulable. Because obviously, if it's just about timing there are other things that would make it even more valuable to a candidate such as being able to control more specifically the message itself. |

The majority's overbreadth is even more disturbing because the Supreme Court proceeded with constitutional caution in the political contribution cases that concern us here.  In *Colorado I*, the Court, rejecting the FEC's meat cleaver approach that would have deemed all political party expenditures as "coordinated" with candidates, upheld an as-applied challenge allowing independent expenditures.  *Colorado Republican Campaign Comm. v. FEC*, 518 U.S. 604, 623-24, 116 S. Ct. 2309, 2319 (1996) ("*Colorado I*").  The Court then remanded for fuller consideration of the party's facial challenge to FECA's coordinated expenditure provision.  *Id.* at 625-26, 116 S. Ct. at 2320-21.  When the Court later took up and rejected the facial challenge in *Colorado II*, it nonetheless acknowledged a potential for future as-applied attacks:

> Whether a different characterization, and hence a different type of scrutiny, could be appropriate in the context of an as-applied challenge focused on application of the limit to specific expenditures is a question that, as Justice Thomas notes, post, at 468, n.2, we need not reach in this facial challenge.  *Cf.* Brief for Petitioner 9, n.5 (noting that the FEC has solicited comments regarding possible criteria for identifying coordinated expenditures).

> The Party appears to argue that even if the Party Expenditure Provision is justified with regard to coordinated expenditures that amount to no more than payment of the candidate's bills, the limitation is facially invalid because of its potential application to expenditures that involve more of the party's own speech. Brief for Respondent 48-49. But the Party does not tell us what proportion of the spending falls in one category or the other, or otherwise lay the groundwork for its facial over breadth claim. Cf.

> Broadrick  v. Oklahoma, 413 U.S. 601 (1973) (overbreadth must
> be substantial to trigger facial invalidation).

*Colorado II*, 533 U.S. at 456, 121 S. Ct. at 2366 n.17.

Thus, the Court majority expressly recognized, as did the dissent, the potential for as-applied challenges to coordinated expenditures that express the contributor's basis for supporting a candidate.  *See also Colorado II*, 533 U.S. at 468, 121 S. Ct. at 2373 (Thomas, J. dissenting).[14]  The litigation history of the *Colorado* case demonstrates the Court's methodical migration from a narrow to a broader challenge of the FECA provision.

The Court took a similar approach in *Citizens United.*  It first analyzed the plaintiffs' arguments that *Hillary: The Movie* did not fall within statutory prohibitions on corporate electioneering communications and, only after rejecting those, reached the ultimate constitutionality of the ban.  Chief Justice Roberts explained:

> It is only because the majority rejects Citizens United's statutory
> claim that it proceeds to consider the group's various

[14] Justice Thomas explained:
The Court makes this very assumption. See *ante*, at 464 ("There is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate"). To the extent the Court has not defined the universe of coordinated expenditures and leaves open the possibility that there are such expenditures that would not be functionally identical to direct contributions, the constitutionality of the Party Expenditure Provision as applied to such expenditures remains unresolved. See, *e.g.*, *ante*, at 456, n. 17. At oral argument, the Government appeared to suggest that the Party Expenditure Provision might not reach expenditures that are not functionally identical to contributions. See Tr. of Oral Arg. 15 (stating that the purpose of the Party Expenditure Provision is simply to prevent someone "from making contributions in the form of paying the candidate's bills").

No. 10-30080, No. 10-30146

> constitutional arguments, beginning with its narrowest claim
> (that *Hillary* is not the functional equivalent of express advocacy)
> and proceeding to is broadest claim (that *Austin v. Michigan
> Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d
> 652 (1990) should be overruled). This is the same order of
> operations followed by the controlling opinion in *Federal Election
> Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 127 S.Ct.
> 2652, 168 L.Ed.2d 329 (2007) (*WRTL*). There the appellant was
> able to prevail on its narrowest constitutional argument because
> its broadcast ads did not qualify as the functional equivalent of
> express advocacy; there was thus no need to go on to address the
> broader claim that *McConnell v. Federal Election Comm'n*,
> 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), should be
> overruled. *WRTL*, 551 U.S., at 482, 127 S.Ct. 2652; *id.*, at 482-
> 483, 127 S.Ct. 2652 (ALITO, J., concurring). This case is
> different—not, as the dissent suggests, because the approach
> taken in *WRTL* has been deemed a "failure," *post*, at 935, but
> because, in the absence of any valid narrower ground of decision,
> there is no way to avoid Citizen United's broader constitutional
> argument.

*Citizens United*, __ U.S. __, 130 S. Ct. at 918 (Roberts, C.J., concurring). The

Chief Justice also noted that the *WRTL* decision rested on a narrower

constitutional basis.

The majority's approach cannot be salvaged by their re-characterization

of the plaintiffs' "own speech" argument as a "facial attack" no different from

the one rejected by the Supreme Court in *Colorado II*. It is true that the line

between facial and as-applied constitutional challenges is not well defined.

*Citizens United,* __ U.S. __, 130 S. Ct. at 893. But it is also true that courts

have the authority to re-frame these arguments to subserve judicial

No. 10-30080, No. 10-30146

restraint[15] and in recognition that the distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id*. (Kennedy J.) (citing *United States v. Nat Treas. Emp's Union*, 513 U.S. 454, 477-78, 115 S. Ct.1003, 1018-19 (1995)).[16] It follows from these principles that the parties "cannot enter into a stipulation that prevents the

---

[15] *Citizens United*, __ U.S. __, 130 S. Ct. at 918 ("If there were a valid basis for deciding this statutory claim in Citizens United's favor (and thereby avoiding constitutional adjudication), it would be proper to do so.").

[16] The courts of appeals have followed this approach, focusing on the factual allegations underlying the challenge. The Second Circuit explained in *Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003):

> The present case has never been explicitly characterized as either facial or as-applied. Rather, plaintiffs' complaint without specificity alleges the ways the ordinance has infringed on their rights in their specific circumstances, and then asks for relief. While some of the claims plaintiffs raise are logically analyzed as facial challenges, e.g., the challenges for overbreadth and vagueness, the equal protection claim is more logically viewed "as-applied" given the statements in the complaint. Even if a facial challenge was intended, a facial challenge in the context of the present equal protection claim would logically include within it an as-applied challenge, and thus we cannot ignore the constitutional violation simply because the words "as-applied" were not used.

*Id*. at 174 n.1 (citation omitted).

Similarly, in *Jacobs v. Florida Bar*, 50 F.3d 901 (11th Cir. 1995), the Eleventh Circuit explicitly recharacterized a challenge based on the facts before it where the appellants were unable to carry a broader facial attack on rules restricting attorney advertising:

> We recognize that Appellants characterized their claim as a facial challenge. We are not, however, bound by Appellants' designation of their claims, as the complaint sets forth a cause of action for an as-applied challenge to the rules. *See McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir.1994) (en banc) ("Our responsibility, however, is to examine [plaintiff's] cause of action for what it actually is, not for what [plaintiff] would have it be," and thus court looks to complaint to determine what claim plaintiff's allegations support) . . .

*Id.* at 905 n.17.

Court from considering certain remedies if those remedies are necessary to resolve a claim that has been presented." *Citizens United*, *Id*. at 893.[17]   Thus, it is improper for the majority to conclude that plaintiffs have somehow pled or argued themselves out of court.   Recharacterizing the plaintiffs' position as a facial attack cannot eliminate the narrower issue concerning the Cao Ad.

This court has the duty to decide the case on stipulated facts brought properly before us.

## III.  Evaluating Cao's As-Applied Challenge

In this as-applied attack on the coordinated expenditure limit that would ban broadcast of the Cao Ad, this court must first determine the appropriate level of scrutiny and then evaluate the evidence concerning the government's regulation.  *WRTL*, 551 U.S. at 456, 121 S. Ct. at 2366 ("With the standard [of scrutiny] thus settled, the issue remains whether adequate evidentiary grounds exist to sustain the limit under that standard[.]").  Two levels of scrutiny govern campaign finance regulations: strict scrutiny and, unique to campaign finance jurisprudence, "closely drawn" scrutiny.  *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S. Ct. 612, 638 (1976).  The former has been applied to candidates' speech and independent expenditures, while the latter applies to contributions and facially to "coordinated expenditures."   Which

---

[17] In *Citizens United*, the Court ignored the plaintiffs' stipulation foreswearing an attack on the corporate contribution ban.  __ U.S. __, 130 S. Ct. at 892-93.

standard pertains to the government's regulation of the Cao Ad depends on whether the ad is core political speech (*see Citizens United,* __ U.S. __, 130 S. Ct. at 890-91)**,** or a functional contribution.  This court is not bound by the government's simply labeling the speech "coordinated":

> [W]e recognize that the FEC may have characterized the expenditures as "coordinated" in light of this Court's constitutional decisions prohibiting regulation of most independent expenditures.  But, if so, the characterization cannot help the Government prove its case. **An agency's simply calling an independent expenditure a "coordinated expenditure" cannot (for constitutional purposes) make it one.** *See, e.g., NAACP v. Button*, 371 U. S. 415, 429 (1963) (the government "cannot foreclose the exercise of constitutional rights by mere labels"); *Edwards v. South Carolina*, 372 U. S. 229, 235–238 (1963) (State may not avoid First Amendment's strictures by applying the label "breach of the peace" to peaceful demonstrations).

*Colorado I*, 518 U.S. at 621–22, 116 S. Ct. at 2319 (emphasis added).

*Buckley* held that contributions to a candidate may be regulated, because contributions, unlike communicative independent expenditures, express merely a general support for a candidate.  *Buckley,* 424 U.S. at 21, 96 S. Ct. at 635.  The FECA defines contributions as including "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate."  2 U.S.C. § 441a(a)(7)(B)(i).  While the Supreme Court has placed great importance on whether speech is coordinated, and thus regarded as a contribution, it has offered no guidance

except to acknowledge that the sweeping term "coordinated expenditures" covers a wide range of activities with varying constitutional attributes:

> The principal opinion in *Colorado I* noted that coordinated expenditures "share some of the constitutionally relevant features of independent expenditures." 518 U. S., at 624. But it also observed that "many [party coordinated expenditures] are . . . virtually indistinguishable from simple contributions." *Ibid.* Coordinated spending by a party, in other words, covers a spectrum of activity, as does coordinated spending by other political actors.

*Colorado II*, 533 U.S. at 444–45, 121 S. Ct. at 2361.

There is no doubt that, standing alone, the Cao Ad is core political speech. The Cao Ad is more than "a general expression of support for the candidate." *Buckley*, 424 U.S. at 21, 96 S. Ct. at 635; *see also Citizens United*, 130 S. Ct. at 890 ("[T]here is no reasonable interpretation of *Hillary* [the movie] other than as an appeal to vote against Senator Clinton, . . . [T]he film qualifies as express advocacy."). The ad expressly advocates for Cao, "communicate[s] the underlying basis for [the RNC's] support," and increases "the quantity of communication." *Buckley*, 424 U.S. at 21, 96 S. Ct. at 635.

Further, the ad hews closely to the independent expenditure side of the spectrum. The RNC independently produced the Cao Ad without input from Cao; the RNC created the ad at its own initiative; the RNC planned the ad's message; the RNC produced the ad; the RNC approved the final version of the ad; and the RNC decided to air the ad. Like the ads in *Colorado I*, the

58

Cao Ad "was developed by the [party] independently and not pursuant to any general or particular understanding with a candidate." *Colorado I*, 518 U.S. at 614, 116 S. Ct. at 2315.[18]  It unambiguously "reflects [the RNC's] members' views about the philosophical and governmental matters that bind them together [and] also seeks to convince others to join those members in a practical democratic task, the task of creating a government that voters can instruct and hold responsible for subsequent success or failure." *Id.* at 615–16, 116 S. Ct. at 2316.

At the opposite  end of the coordination spectrum are instances in which a party simply pays its candidate's bills.  *See Buckley*, 424 U.S. at 46, 96 S. Ct. at 648 n.53; *see also Colorado I*, 518 U.S. at 624, 116 S. Ct. at 2320. Apparently rejecting the spectrum approach, the FEC asserts that the Cao Ad is functionally the same as a cash contribution to the candidate. This is inaccurate.  The critical differences between the Cao Ad and a direct contribution or "footing the candidate's bills" include the ad's initiator, message, quality, ultimate source of approval, and decision to air.  The Cao Ad is not "virtually identical" to one that  Cao might produce.  *See Cao*, 688 F.

---

[18] *Colorado I* listed several features of an "independent expenditure"  which pertain to this inquiry:  (1)  Whether the party independently decided to create the ad on its own initiative; (2) Whether the party independently developed the ad; (3) Whether the party's leadership independently approved the ad; (4) Whether the party independently decided to circulate the ad; (5) Whether the party claims ownership of the ad within the ad itself; (6) Whether, when viewed objectively, the ad is appears to be the party's own.  *Colorado I*, 518 U.S. at 613–14, 116 S. Ct. at 2315.

Supp. 2d at 533 (explaining that Cao found many independent expenditures to be counterproductive and harmful).  Further, despite the timing coordination, the ads "may well provide little assistance to the candidate's campaign and indeed may prove counterproductive." *Buckley*, 424 U.S. at 47, 96 S. Ct. at 648.  Because the party decides to create and air the ad of its own initiative,  the candidate cannot depend on it.  The candidate will not know whether the ad is effective.  If the ad is useful to the candidate, then it is useful only because the interests of the party and the candidate coincide.  On all these grounds, there is no significant functional difference between the Cao Ad and a constitutionally protected independent expenditure.

Compared with the *Colorado II* pronouncement that the coordinated expenditure limits are facially valid, this case presents the narrow question whether *de minimis* coordination transforms otherwise constitutionally protected core political speech into something less.  We believe it does not. Because the Cao Ad represents core political speech, it should be evaluated under the traditional strict scrutiny test.  *See Colorado II*, 533 U.S. at 443–44, 121 S. Ct. at 2360*; Colorado I*, 518 U.S. at 614-15, 116 S. Ct. at 2315;. Alternatively, even if "closely drawn" scrutiny is required because of *Colorado II*, the Cao Ad cannot be subjected to dollar limits.

A.    Applying Strict Scrutiny

That a statute has been held facially valid does not answer whether it may be constitutionally applied in a specific circumstance. *WRTL*, 551 U.S. at 464, 127 S. Ct. at 2663–64. Instead "[a] court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech." *WRTL*, 551 U.S. at 464-65, 127 S. Ct. at 2664; *id*. at 477-78, 127 S. Ct. at 267; *See also Citizens United*, 130 S. Ct. at 898 (justifying regulation of speech "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." (internal quotation marks omitted)); *First Nat'l. Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S. Ct. 1407, 1421 (1978). Moreover, the government bears the burden to demonstrate that the law is constitutional as applied to plaintiffs' speech. *WRTL*, 557 U.S. at 464, 127 S. Ct. at 2663.

The government contends that regulating timing-only coordination furthers its compelling interest in preventing corruption or its appearance or circumvention of the contribution limits. The FEC also argues that an expansive definition of "coordination" is necessary to ensure that it can regulate all coordinated expenditures that truly are *de facto* contributions. But because the Cao Ad represents expressive political speech, the government's position cannot be squared with *WRTL*:

This Court has long recognized "the governmental interest in preventing corruption and the appearance of corruption" in election campaigns. *Buckley*, 424 U.S., at 45, 96 S. Ct 612. This interest has been invoked as a reason for upholding *contribution* limits. As *Buckley* explained, "[t]o the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined." *Id*., at 26-27, 96 S. Ct. 612. We have suggested that this interest might also justify limits on electioneering *expenditures* because it may be that, in some circumstances, "large independent expenditures pose the same dangers of actual or apparent *quid pro quo* arrangements as do large contributions." *Id*., at 45, 96 S. Ct. 612.

*McConnell* arguably applied this interest—which this Court had only assumed could justify regulation of express advocacy—to ads that were the "functional equivalent" of express advocacy. *See* 540 U.S. at 204-206, 124 S. Ct. 619. But to justify regulation of WRTL's ads, this interest must be stretched yet another step to ads that are *not* the functional equivalent of express advocacy. Enough is enough. Issue ads like WRTL's are by no means equivalent to contributions, and the *quid-pro-quo* corruption interest cannot justify regulating them. To equate WRTL's ads with contributions is to ignore their value as political speech.

Appellants argue that an expansive definition of "functional equivalent" is needed to ensure that issue advocacy does not circumvent the rule against express advocacy, which in turn helps protect against circumvention of the rule against contributions. *Cf. McConnell*, *supra*, at 205, 124 St. Ct. 619 ("[R]ecent cases have recognized that certain restrictions on corporate electoral involvement permissibly hedge against circumvention of [valid] contributions limits" (internal quotation marks omitted; brackets in original)). But such a prophylaxis-upon-prophylaxis approach to regulating expression is not consistent with strict scrutiny.

*WRTL*, 551 U.S. at 478-79, 127 S. Ct. at 2672.

The import of *WRTL* is clear. Even if the record afforded some support

for regulating timing-only coordination, which it does not, discussed *infra*, it

clearly does not support treating the Cao Ad as the "functional equivalent" of a mere monetary contribution. The expressive content of the ad prevents that. In addition, the risk of circumvention of campaign contribution limits is not appreciably greater here than it is with "independent" expenditures. The candidate lacks control or influence over the initiation, production, and content of the party ad. The party decides whether or not an ad will be made, what it will say, what it will look like, and whether it will air. The candidate may or may not approve of the ad or find it useful.

Consequently, this expenditure will be useful to the candidate only to the extent that his and the party's interests coincide. Should the candidate "encourage" donors to give money to the party, he cannot be certain whether these party donations will be more useful to him than an independent expenditure. Without some link of candidate control or influence, neither the *quid pro quo* corruption nor appearance of corruption that justifies contribution limits can occur. *Colorado II*, 533 U.S. at 464, 121 S. Ct. at 2370 (discussing a "link in a chain of corruption by-conduit"); *Citizens United* 130 S. Ct. 876, 908 (preventing corruption or its appearance is the government's only valid interest in limiting political speech).

The FEC essentially argues, as it did in *WRTL*, that expansive definitions of coordination and coordinated expenditures are needed to ensure that coordinating solely the broadcast timing of the party's ad does not

circumvent the rule against coordinated expenditures which in turn helps to

prevent circumvention of contribution limits which culminates in preventing

quid pro quo corruption or the appearance of such corruption.  This is no more

than the "prophylaxis-upon-prophylaxis" speculation rejected by *WRTL*,

551 U.S. at 479, 127 S. Ct. at 2672.  It is an overly broad approach that here

sweeps up protected speech.  And the government's logic, that the greater

coordination includes the lesser (this coordination), is unambiguously rejected

by *WRTL*: "This greater-includes-the-lesser approach is not how strict

scrutiny works . . . . A court applying strict scrutiny must ensure that a

compelling interest supports each application of a statute restricting speech."

551 U.S. at 477-78, 127 S. Ct. at 2671.[19]

B.    Applying "Closely Drawn" Scrutiny

Even if the regulation of the Cao Ad must be evaluated under *Buckley's*

"closely drawn" standard because of its *de minimis* coordination, the

government still must affirmatively demonstrate some sufficiently important

interest—preventing corruption, the appearance of corruption, or

circumvention.  *Buckley*, 424 U.S. at 25, 96 S. Ct. at 638 (contribution limits

may be upheld only if the "*[s]tate demonstrates* a sufficiently important

---

[19] In a case concerning the criminalization of virtual child pornography, a subject deserving far less First Amendment scrutiny, the Court rejected a similar contention, stating, "[T]hat protected speech may be banned as a means to ban unprotected speech . . . . turns the First Amendment upside down." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S. Ct. 1389, (2002).

interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms" (emphasis added)); *Edenfield v. Fane*, 507 U.S. 761, 770-771, 113 S. Ct. 1792, 1800 (1993) (when regulating speech under intermediate scrutiny, the government must "demonstrate that the harms it recites are real" and that standard is "not satisfied by mere speculation or conjecture.")  The government remains obliged to present evidence that the interest applies to the facts before us.  *McConnell v. FEC*, 540 U.S. 93, 144, 185 n.72, 124 S. Ct. 619, 661, 684(2003); *Colorado II*, 533 U.S. at 457, 121 S. Ct. at 2367.  Not to require some level of proof by the government would allow censorship of the party's ad based on nothing more than the general proof offered to sustain the statute's facial validity in *Colorado II*.

The FEC offered <u>no</u> evidence or argument that coordination of the Cao Ad as to broadcast timing will appreciably increase the risk or appearance of corruption or circumvention of contribution limits.  The record contains fifty-nine exhibits spanning thousands of pages, much of which  was part of the record in *Colorado II* or *McConnell*.  There are academic studies, expert testimony before Congress, invitations to various events put on by political parties, and many affidavits by politicians, former politicians, and political advisors.  Overall, the record evidence proves that money plays a primary role in political campaigns, that parties and party leaders are significantly involved in political fund-raising, and that independent groups have played

an increasing role in recent years.  More money than ever is being raised, and election advertising has become more important and more of a science than ever before. Frequently, this money, whether it travels through campaigns, parties, or independent groups, opens up opportunities for access to candidates and politicians.  In short, despite FECA, as amended by McCain-Feingold, money and politics remain inextricably linked, and may be more entangled than they were at the time of FECA's passage.[20]

None of this, however, demonstrates that the specific type of coordination at issue in this case, concerning the timing of otherwise-independent expenditures, has any propensity to increase *quid pro quo* corruption or the appearance of corruption or to promote circumvention of contribution limits.  Indeed, the voluminous evidentiary record contains only a few, incidental references to timing coordination.  For example, a campaign finance expert opines that "Giving candidates a direct say in whether, when, and how often a party's speech is broadcast essentially gives them a direct

---

[20] The majority is "shocked" to note that the major political parties spent well over $100 million apiece on independent expenditures during the 2008 election.  To the contrary, this is not an exorbitant sum.  To put this amount in perspective, consider that a mere 24 individuals contributed a total of $142 million to tax-exempt 527 organizations in 2004 and that 527 and 501(c) groups spent more than $400 million in the 2008 federal elections.  S. Weissman and R. Hassan, *BCRA and the 527 Groups*, in THE ELECTION AFTER REFORM 79, 92-96 (M. Malbin ed. 2006); Press Release, Campaign Finance Inst., Soft Money Political Spending by 501(c) Nonprofits Tripled in 2008 Election (Feb. 25, 2009), *available at* http://www.cfinst.org/Press.aspx.  Even this amount of money is a trifle in the world of marketing.  A single corporation, Procter & Gamble, annually spends $2.7 billion on advertising to promote its products in the United States.  Suzanne Vranica & San Schechner, *P&J Signs Ad Deal*, WALL ST. J., April 22, 2010, at B6.

say in the content of what the voters get to hear." Content, however, is not at issue in this case. A former politician states that party advertisements in the final days of a campaign can make the difference between winning and losing. Coordination is hardly necessary to draw that conclusion. One campaign consultant complained that "the clutter on television during the last few weeks of the campaign really prevented our message from getting through as clearly as we would have liked." No doubt. What is absent from the record is any discussion or evaluation (let alone evidence) on whether timing coordination increases the risk of corruption or its appearance. Instead, the record simply includes blanket conclusions that any coordination increases the risk.

In contrast, the general evidence demonstrating risks of circumvention presented in *Colorado II* involved situations where the candidate retained real control over the party's coordinated expenditures. Candidates controlled the message and its presentation and, ultimately, approved of those coordinated expenditures. *See* 533 U.S. at 457-60, 121 S. Ct. at 2367-68. Here, Cao had no influence over the RNC's speech save what time it would air. The candidate does not even have input into whether or on what stations the ad will air, only when it will air, and he cannot be certain that the party will heed his advice. If there is any heightened possibility of corruption or circumvention in this arrangement, the government has not pointed to it, and

we ought not to invent some conceivable interest that the government itself is unable to articulate or prove.

Nor, in this instance, are entirely uncoordinated expenditures an adequate alternative to minimally coordinated speech.  The record demonstrates that FEC's coordination-regulation regime prevents party leaders from exercising any degree of control over their party's advertisements in support of a candidate.[21]  Because party leaders inevitably associate with candidates, to avoid the taint of coordination parties must establish "independent expenditure programs" staffed by hired consultants who are responsible for all aspects of the party's communications, from polling and research to writing the scripts, but for the topline budget.  In effect, a party has no control over its own message.  The party leaders must make a Hobson's choice between talking to their own candidates and controlling their own party's message.  The government justifies this regime

---

[21] The district court found:

49.  Because the RNC has a continuous and ongoing relationship with its candidates, special measures must be taken to do independent expenditures regarding its candidates.  The RNC has extensive discussions with its candidates about their needs, activities and strategy.  As a result, activities by the RNC about its candidates may be deemed to be coordinated with its candidates, subjecting these activities to the FECA's coordinated expenditure and contribution limits.  In order to engage in any independent expenditure supporting one of its candidates, the RNC may hire an outside consulting group to do the independent expenditures but neither the RNC nor any of its officers, employees or agents may have any involvement in the independent expenditure in order for it to be truly independent.  In fact, neither the chairman of the RNC nor any of the RNC's officers, employees or agents has control over the message of an independent expenditure yet the RNC bears responsibility for that message.  The RNC makes its independent expenditures in this way out of a belief that there is no way to have a true "firewall policy."  (Emphasis added).

68

by reference to the risk of "circumvention."  But by prohibiting speech subject to *de minimis* coordination, the FEC severely abridges parties' constitutionally protected right to engage in independent expenditures—in other words, to speak in public in support of their own candidates.  After *Citizens United*, a party is more constrained in its ability to engage in political speech than a run-of-the-mill business or corporation.

"Closely drawn" scrutiny has to mean <u>something</u> when applied to censorship of core political speech.  Where the government cannot demonstrate a compelling interest, and the effect of regulation in this case is to ban the Cao Ad, the  regulation cannot be "closely drawn."

## IV.  The Majority Opinion

Even taking the majority on their own terms, *Colorado II* does not foreclose the plaintiffs' broader "own speech" argument.  As we have noted, the majority's analysis of the plaintiffs' "own speech" argument simply misses the point: it is <u>speech</u>, not pencils, that the RNC has paid for.  The spectrum of expenditures that may be coordinated with a candidate is potentially limitless.  Coordinated expenditures that are functionally like monetary contributions, and are only symbolically expressive according to *Buckley*'s dichotomy, continue to fall comfortably within the range in which monetary limits must be upheld to prevent quid pro quo corruption or the appearance of such corruption.  Consequently, the majority's fear that the bottom would fall

out of FEC regulation of coordinated expenditures if RNC succeeds here is groundless.

Second, because the Cao Ad is undeniably core political speech, the majority is incorrect to dismiss the two most recent cases in which the Supreme Court has addressed whose communicative speech may be constitutionally limited and in what way. Neither *Citizens United* nor *WRTL* controls the present case, but both are informative; their bedrock defense of core political speech and their systematic approach to First Amendment standards of review cannot be waved away by reciting differences in degree, not kind, between the speakers and types of speech at issue. Finally, the majority's treatment of plaintiffs' "own speech" argument erases the distinction between facial and as-applied challenges. If the Cao Ad must be banned as a coordinated expenditure, despite its provenance and character as core political speech, the majority opinion "eviscerates" both the acknowledgment in *Colorado I* and *II* of the wide spectrum of potentially coordinated expenditures and the recognition in *Colorado II* that as-applied challenges were foreseeable. In short, the plaintiffs may have reached beyond the grasp of judicial power by promoting a largely hypothetical "own speech" position. The majority, however, seriously abdicated their responsibility to protect First Amendment political speech and to apply governing Supreme Court authorities.

No. 10-30080, No. 10-30146

## V. Conclusion

The constitutional rules governing campaign finance law are presently in a state of flux, *see Green Party of Conn. v. Garfield*, ___ F.3d ___, 2010 WL 2737134 (2d Cir. July 13, 2010), but there is a clear trend favoring the protection of political speech. Beginning with *WRTL*, the Supreme Court has, in measured steps, protected political speech while leaving the scaffolding of *Buckley* in place. It has cast aside both recently enacted speech restrictions, *see WRTL*, and decades-old speech restrictions, *see Citizens United*. Lower courts have conformed to this trend. *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010); *N.M. Youth Organized v. Herrera*, ___ F.3d ___, 2010 WL 2598314 (10th Cir. June 30, 2010).

In each of those instances, the Supreme Court has demanded, to justify banning speech, that the government provide strong evidence of a compelling interest in preventing the appearance or occurrence of corruption. Where there is uncertainty about the government's interest, "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *WRTL*, 551 U.S. at 457, 127 S. Ct. at 2659. Like Wisconsin Right to Life's issue ads or Citizen United's *Hillary: The Movie*, the Cao Ad is core political speech. The RNC wishes to coordinate with Cao on its broadcast timing, but the Supreme Court has never spoken on what degree of contact makes expressive political speech "coordinated" such that it may be

71

suppressed. The Supreme Court's recent decisions demand much more from the government than it has presented here—essentially nothing. Even if the government were to meet its burden, it seems inconceivable that in this country founded on the hope and reality of free and open political debate, otherwise independent political speech could be banned because its speakers have asked a candidate, "When do we air the ad?"

It is not our place to revisit whether the government may generally regulate coordinated expenditures. Still less is it our place to approve the banning of a specific political ad simply because the Court has held that when coordinated expenditures are generally analogous to paying the candidates's bills, they may be regulated. But when it comes to defining what speech qualifies as coordinated expenditures subject to such regulation—the issue we *do* have to decide—we should follow Chief Justice Roberts's admonition in *WRTL*:

> [W]e give the benefit of the doubt to speech, not censorship. The First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech" demands at least that.

*WRTL*, 551 U.S. at 482, 127 S. Ct. at 2674.

We respectfully dissent.

EDITH BROWN CLEMENT, Circuit Judge, with JONES, Chief Judge, and SMITH and ELROD, Circuit Judges, concurring in part and dissenting in part.

I join the Chief Judge's dissent because I believe the Party Expenditure Provision cannot be constitutionally applied to the Cao ad. I write separately to note that I would go further than the Chief Judge in fashioning a standard that protects political speech that is not the functional equivalent of a campaign contribution.

The Chief Judge and I agree on much. We agree that this as-applied challenge is not, as the majority erroneously assumes, foreclosed by *Federal Election Commission v. Colorado Republican Campaign Committee*, 533 U.S. 431 (2001) ("*Colorado II*"). We also agree that the court's task is to fashion a standard for determining whether a coordinated expenditure is the functional equivalent of a contribution, and that *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL*"), provides guidance about what that standard ought to look like. We agree that coordination merely as to timing does not make the Cao ad the functional equivalent of a contribution and that the ad is accordingly protected by strict scrutiny. Finally, we agree that the government's asserted interest in banning this ad does not survive such scrutiny.

However, I see no reason that timing alone makes any difference in the constitutional analysis, and question whether a *de minimis* standard provides a line bright enough to avoid chilling protected speech through the threat of an enforcement action. The Supreme Court has drawn the relevant distinction between an expenditure and a contribution: a contribution "serves as a general expression of support for the candidate and his views," while an expenditure "communicate[s] the underlying basis for the support." *Buckley v. Valeo*, 424 U.S. 1, 21 (1976). The Court has also identified the goal of the anti-coordination rules: preventing circumvention of the contribution limits by expenditures that

amount to simply paying a candidate's bills. *See Buckley*, 424 U.S. at 47 n.53 (noting that an expenditure is not coordinated if it is "incurred without the request or consent of a candidate or his agent") (citing H.R. REP. No. 93-1239 at 6 (1974)); *see also Colorado II*, 533 U.S. at 457-60 (describing circumvention); *Colo. Republican Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 624 (1996) ("*Colorado I*") (describing expenditures that are "virtually indistinguishable from simple contributions"). A "timing only" standard does nothing to capture the difference between these two constitutionally distinct forms of communication. The same could be said of other standards based on the manner of coordination, such as medium (radio versus television); venue (the local Spanish-language channel versus the soft rock channel); or region (the Lower Ninth Ward versus Uptown New Orleans).

Likewise, a *de minimis* standard is difficult to apply and interpret. The FEC would be required to develop extensive regulations drawing lines between *de minimis* and prohibited coordination. Courts attempting to adjudicate the application of these regulations to specific factual situations would find themselves drawn into similar hair splitting. Litigants would be forced to respond to extensive discovery on the substance of their contacts with the candidate. A speaker contemplating engaging in speech such as the Cao ad would face a "burdensome, expert-driven inquiry, with an indeterminate result." *WRTL*, 551 U.S. at 469. Despite the best intentions of such a standard, "it will unquestionably chill a substantial amount of political speech." *Id.*

What does make a difference in the constitutional analysis, however, is coordination as to the content of the ad. The Cao ad is the RNC's own speech, expressing *its* views on political issues, and identifying Cao as a candidate who supports those views. Cao did not provide input on its content and was not asked to provide his consent to run the ad. If he had, that would indeed raise a suspicion that the parties were attempting to circumvent the rules against

coordination so that the RNC could pay the bill for *Cao's* speech—the evil at which the coordination rules are aimed.[1]

Accordingly, I would propose a two-pronged standard that is "content-driven," rather than one that turns on the degree of coordination. Specifically, I would propose the following: An advertisement is functionally identical to a contribution only if it is susceptible of no other reasonable interpretation than as a general expression of support for the candidate, *and* the ad was not generated by the candidate. Under this standard, the speaker could only take refuge in the safe harbor of a content-driven standard if the speech conveys the underlying basis of the support, and was not merely adopted speech indistinguishable from paying a candidate's advertising bills. This approach shares all the characteristics of the standard the Court adopted in *WRTL*: it is clear, objective, and content-driven, and because it is relatively simple for both speakers and regulators to understand and apply, will not chill speech through the threat of litigation. It limits discovery to a factual issue that is relatively easy to ascertain, *i.e.*, whether the ad was generated by or its content approved by the candidate or the political party. It references the fundamental distinction the Court drew between contributions and expenditures in *Buckley*, and exempts from its protection expenditures that amount to a party merely paying a candidate's bills. The standard would also align more closely than other possible standards with the actual definition of a coordinated expenditure, which

---

[1] The majority argues that what it calls "timing-plus-content-awareness coordination" raises "exactly" the same circumvention concerns as if Cao had provided input on the content of the ad or given his permission for the ad to run. Maj. Op. at 35–36. This is not the case. Once again, the majority refuses to analyze this ad along the lines the Court demands: whether it is merely a general expression of support for the candidate versus one that communicates the underlying basis for the support. *Buckley*, 424 U.S. at 21. Such analysis distinguishes the Cao ad from a communication generated by Cao that the RNC pays to have broadcast. Furthermore, the majority's approach is precisely that rejected by the Court in *WRTL*: the "prophylaxis-upon-prophylaxis" approach of banning protected speech because that makes it easier to ban unprotected speech. 551 U.S. at 479. To quote the Court: "Enough is enough." *Id.* at 478.

prohibits spending "*at the request or suggestion of*, a candidate." 2 U.S.C. § 441a(a)(7)(B)(I) (emphasis added).

Applying this standard, the Cao ad is not functionally identical to a campaign contribution. The ad was generated by the RNC. It expresses not merely the kind of generalized sentiment—"Vote for Joseph Cao"—that the Court has described as the hallmark of a contribution, but expresses the RNC's view on important matters of public concern and urges a vote for Cao because he shares the same views. While the "takeaway" message of this advertisement may be one urging support for Cao, the message is anchored and inspired not by the RNC's support for Cao, but by Cao's support for the views expressed by the RNC. The ad thus communicates the underlying basis for the support, making it more like an expenditure protected by strict scrutiny. This is far from the archetypal coordination described in *Buckley*: effectively paying a candidate's advertising bills. The Cao ad can reasonably be interpreted as something other than a general expression of support for a candidate and was not generated by Cao, and as such, strict scrutiny should apply to laws regulating this ad.

Most importantly, this standard is faithful to what I take to be the central lesson of *WRTL*: that "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." 551 U.S. at 474. Like the advertisements in *WRTL*, the Cao ad is indisputably political expression, one that in any other context would merit the highest degree of protection. *See Buckley*, 424 U.S. at 48 ("[T]he First Amendment right to 'speak one's mind . . . on all public institutions' includes the right to engage in 'vigorous advocacy' no less than 'abstract discussion.' Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation.") (quotations omitted) (ellipsis in original)). The Court has emphasized that political parties have the First Amendment right to speak on political issues and

explicitly acknowledged that coordinated expenditures "share some of the constitutionally relevant features of independent expenditures." *Colorado I*, 518 U.S. at 624. Speech that articulates a set of political views and explains the speaker's support of a candidate in terms of that candidate's endorsement of those views—*i.e.*, speech that conveys the underlying basis of support—is speech that implicates the strongest and most compelling First Amendment interests.

In any case dealing with campaign finance law it is easy to mystify oneself—and one's audience—with talk of "coordination," "circumvention," "functional equivalent," and the like. These bland phrases mask the import of the absolutist position the majority has taken today. The standard I have proposed makes distinctions and is consistent with the Court's often difficult precedents in this area, but it proceeds from a fairly simple impulse: If the First Amendment means anything, it means that political speech is not the same thing as paying a candidate's bills for travel, or salaries, or for hamburgers and balloons. In this case, a group of citizens has banded together to express their views on important public matters. Congress has abridged their freedom to do so. This the Constitution does not permit. I respectfully dissent.